**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-2026
_____

JAMES D. FREEMAN,
Appellant

v.

PITTSBURGH GLASS WORKS, LLC; PGW AUTO
GLASS, LLC
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
District Court No. 2-10-cv-01515
District Judge: The Honorable Arthur J. Schwab

Argued January 16, 2013

Before: SMITH, CHAGARES, and BARRY,
*Circuit Judges*

(Opinion Filed:  March 6, 2013)

Bruce C. Fox        [ARGUED]
Obermayer, Rebmann, Maxwell & Hippel
BNY Mellon Center
500 Grant Street
Suite 5240
Pittsburgh, PA 15219
        *Counsel for Appellant*

David S. Becker
Jeffrey J. Mayer    [ARGUED]
Freeborn & Peters
311 South Wacker Drive
Suite 3000
Chicago, IL 60606

Robert B. Cottington
Cohen & Grigsby
625 Liberty Avenue
Pittsburgh, PA 15222
        *Counsel for Appellees*

———————————

OPINION

———————————

SMITH, *Circuit Judge.*

James Freeman recently lost an arbitration dispute. Soon thereafter, he discovered that the arbitrator had received contributions for a judicial campaign from PPG Industries, the defendants' minority owner. Freeman filed a motion to vacate the arbitration award, but he conveniently failed to mention that the law firm representing him had contributed a far greater amount to the same campaign. The District Court denied the motion, and we will affirm.

I

Freeman was a director of operations at PPG Auto Glass until his firing in 2008. At the time of Freeman's firing, PPG Auto Glass was a division of PPG Industries. Since then, PGW Auto Glass and Pittsburgh Glass Works—collectively known as PGW—have assumed PPG Auto Glass's liabilities. Significantly, PPG Industries maintains a 40-percent interest in PGW.

After losing his job, Freeman sued PGW in the District Court for the Western District of Pennsylvania. Freeman was sixty years old at the time of his firing, and he brought a claim under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq*. The case was assigned to U.S. District Judge Arthur Schwab. At the close of discovery, Judge Schwab held a settlement conference at which the parties entered a binding arbitration agreement. The court directed the clerk to mark the case closed. *See* Supp. App. 11 ("[T]his case

shall be marked CLOSED.").[1]

As part of the agreement, both sides listed three potential arbitrators, and Maureen Lally-Green appeared at the top of both lists. Lally-Green is an experienced jurist who served as a judge on the Pennsylvania Superior Court for over a decade. Two years before her retirement in 2009, she made an unsuccessful bid for a seat on the Pennsylvania Supreme Court. She now works in private practice and teaches at Duquesne University School of Law.

On August 22, 2011, the parties spoke with Lally-Green for the first time. She reminded them, "you all know that it's a small legal community here," and she acknowledged that she "knew some people at PPG [Industries]," the minority owner of PGW. App. 5e to 5f. She also told the parties that she taught a seminar on labor law. According to PGW, she explained that she taught the seminar with Joseph Mack, PPG Industries' senior employment attorney. *See* Supp. App. 65; App. 8c. But Freeman maintains that she did not mention Mack or reveal anything else about her relationship with PPG Industries. *See* App. 7a to 7b. Undeterred, the parties proceeded with Lally-Green as their arbitrator.

---

[1] The parties filed separate appendices. We refer to Freeman's appendix as "App." and to PGW's appendix as "Supp. App."

Lally-Green conducted a hearing near the end of 2011. Each side had a day to present evidence. By all accounts, the proceeding was fair and thorough—neither party raises any issue concerning the arbitration hearing itself. One month later, Lally-Green issued a lengthy opinion that rejected Freeman's discrimination claim. She concluded that Freeman lost his job because he "had limited recent sales experience . . . [and] received average performance ratings in a poorly performing region." Supp. App. 54.

Three months later, Freeman filed a motion in the District Court to vacate Lally-Green's arbitration decision. Whether born of sour grapes or a desire for justice, this motion claimed that Lally-Green had failed to disclose campaign contributions that she had received from PPG Industries and its employees during her Supreme Court bid. These contributions totaled $4,500.[2] To put this in perspective, Lally-Green raised over $1.7 million during her unsuccessful campaign. *See* Supp. App. 85. The motion also claimed that Lally-Green had

---

[2] Lally-Green received $2,000 from PPG Industries, $1,000 from Mack, the company's senior employment attorney, $500 from its general counsel and senior vice president, $500 from its vice president of government affairs, and $500 from its director of government affairs. *See* App. 3b.

5

failed to disclose her teaching relationship with Mack. In light of these nondisclosures, Freeman urged the District Court to vacate the arbitration. He argued that Lally-Green was evidently partial in violation of 9 U.S.C. § 10(a)(2) and that she had fraudulently induced the arbitration agreement.[3]

Freeman's motion omitted an important fact. As PGW soon pointed out, Lally-Green had received more than five times as much money—roughly $26,000—from the law firm that represented Freeman during the arbitration.[4] This firm continues to represent Freeman on appeal. To prove Lally-Green's impartiality, PGW cited the two-sided nature of the contributions as well her

_____

[3] According to the relevant statutory language, "[i]n any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—(1) where the award was procured by corruption, fraud, or undue means [or]; (2) where there was evident partiality or corruption in the arbitrators, or either of them . . . ." 9 U.S.C. § 10(a).

[4] Lally-Green received $20,000 from the law firm of Obermayer, Rebmann, Maxwell & Hippel and $6,153 from three attorneys at the firm. *See* App. 3b. Freeman's counsel of record on appeal apparently did not contribute to the campaign.

6

equanimity during the proceedings. PGW also argued that the District Court lacked jurisdiction to consider the motion because it had closed the original case.

The District Court saw "no reason why the [ ] challenge [could] not occur in the same case as the original proceeding." App. 3g n.1. As for Freeman's partiality and fraud claims, the court concluded that Lally-Green's nondisclosures were immaterial and insubstantial. The court thus denied Freeman's motion, and Freeman filed a timely notice of appeal.

Freeman now maintains that Lally-Green was evidently partial and that she fraudulently induced the arbitration agreement. For its part, PGW denies these allegations and raises two threshold arguments—namely, that the District Court lacked jurisdiction to consider Freeman's motion and that Freeman waived his partiality objection. We turn to these arguments.

II

We must first decide whether the District Court had jurisdiction to consider Freeman's motion to vacate. The court indisputably had federal-question jurisdiction to consider his initial complaint. 28 U.S.C. § 1331. But in PGW's view, the court lost jurisdiction once it closed the case and sent the parties to arbitration. If so, the court would need a separate jurisdictional basis to consider

7

Freeman's motion to vacate.[5] Absent a separate basis, the court lacked jurisdiction and we must remand for dismissal. *See Packard v. Provident Nat'l Bank*, 994 F.2d 1039, 1050 (3d Cir. 1993). The problem with this argument is that it relies on a faulty premise. As will soon be clear, the District Court never lost jurisdiction because it administratively closed the case.

Federal courts have long distinguished dismissals from administrative closings. The two procedures have different practical and jurisdictional effects. The Supreme Court discussed the effects of a dismissal in *Green Tree Financial Corp. v. Randolph*, 531 U.S. 79 (2000). There, the district court had dismissed the plaintiff's claims with prejudice after referring the parties to arbitration. The Supreme Court considered whether that dismissal was an

---

[5] The District Court lacked any independent federal-question jurisdiction to consider Freeman's motion. His motion challenged the arbitration based on the Federal Arbitration Act, which "does not create any independent federal-question jurisdiction under 28 U.S.C. § 1331 or otherwise." *Moses H. Cone Mem'l Hosp. v. Mercury Constr.*, 460 U.S. 1, 25 n.32 (1983). The parties disagree whether the District Court had diversity jurisdiction under 28 U.S.C. § 1332, but we need not decide that issue because, as we explain, the District Court retained federal-question jurisdiction.

appealable final order under the Federal Arbitration Act. It noted that the "order plainly disposed of the entire case on the merits and left no part of it pending before the court." *Id.* at 86. It then stated that the Federal Arbitration Act "permit[s] parties to arbitration agreements to bring a separate proceeding in a district court to enter judgment on an arbitration award once it is made (or to vacate or modify it)." *Id.*

Our cases have extended the Supreme Court's analysis. Two years after *Green Tree*, we held that any order that dismisses a case for arbitration is final—even when the district court dismisses the case without prejudice. *See Blair v. Scott Specialty Gases*, 283 F.3d 595, 602 (3d Cir. 2002). We noted that "[t]he *Green Tree* decision draws a distinction between dismissals and stays, but does not draw any distinctions within the universe of dismissals." *Id.*; *see Morton Int'l v. A.E. Staley Mfg.*, 460 F.3d 470, 477–78 (3d Cir. 2006). As a result, anyone who wishes to challenge an arbitration after a dismissal must bring a separate action. *See Green Tree*, 531 U.S. at 86.

By contrast, administrative closings are not final orders. *See WRS, Inc. v. Plaza Entm't*, 402 F.3d 424, 429 (3d Cir. 2005). We first discussed administrative closings in *Penn West Associates v. Cohen*, 371 F.3d 118 (3d Cir. 2004). In that case, the parties had reached a tentative settlement agreement. The district court then ordered the

9

clerk to mark the case "closed." *Id.* at 121. We concluded that the district court had administratively closed the case. For that reason, the court should have reopened the case after the agreement fell apart.

District courts often use administrative closings to prune their overgrown dockets. *Id.* at 128. The practical effect is "to remove a case from the court's active docket and permit the transfer of records associated with the case to an appropriate storage repository." *Lehman v. Revolution Portfolio L.L.C.*, 166 F.3d 389, 392 (1st Cir. 1999). Administrative closings are particularly useful "in circumstances in which a case, though not dead, is likely to remain moribund for an appreciable period of time." *Id.*

Most importantly, administrative closings have no effect on the district court's jurisdiction. *Penn West*, 371 F.3d at 128. As the First Circuit explained, "[a]dministrative closings comprise a familiar, albeit essentially ad hoc, way in which courts remove cases from their active files without making any final adjudication." *Lehman*, 166 F.3d at 392. This means that a court may reopen a closed case—either on its own or at the request of either party—even if it lacks an independent jurisdictional basis for doing so. *See Fla. Ass'n for Retarded Citizens, Inc. v. Bush*, 246 F.3d 1296, 1298 (11th Cir. 2001) ("Designating a case 'closed' does not prevent the court from reactivating a case either of its

own accord or at the request of the parties."). There is substantial unanimity on this issue. *See Dees v. Billy*, 394 F.3d 1290, 1294 (9th Cir. 2005) ("[T]hose circuits that have confronted the issue have unanimously [agreed] . . . that an administrative closing has no jurisdictional effect."); *Penn-Am. Ins. v. Mapp*, 521 F.3d 290, 297 (4th Cir. 2008); *cf. Green Tree*, 531 U.S. at 87 n.2 (concluding that if the district court had "entered a stay instead of a dismissal," its order would not have been final).

It is clear that the District Court administratively closed Freeman's case. On August 5, 2011, the parties agreed to arbitrate their dispute. The court ordered that the case "be marked CLOSED." Supp. App. 11. After losing at arbitration, Freeman filed a motion to vacate the decision. The District Court denied that motion on April 9, 2012 and stated that the case "shall REMAIN CLOSED." Supp. App. 10. The court never mentioned a dismissal—either with or without prejudice. Indeed, the order used language that closely matches the language in our prior closing cases. *Compare Penn West*, 371 F.3d at 121 ("IT IS HEREBY ORDERED that the Clerk of the Court mark the above captioned matter closed."), *and WRS*, 402 F.3d at 426 ("The Clerk shall accordingly mark the above-captioned case as closed."), *with* Supp. App. 11 ("[T]his case shall be marked CLOSED.").

PGW nevertheless urges us to construe the District

11

Court's order as a final order—in effect, a dismissal—because it "end[ed] the litigation on the merits and le[ft] nothing for the court to do but execute the judgment." *Catlin v. United States*, 324 U.S. 229, 233 (1945). In short, PGW wants us to ignore the text of the order and divine a contrary judicial intent. That we will not do.

Words matter. "The judicial process works best when orders mean what they say. Surprising interpretations of simple language—perhaps on the basis of a judicial intent not revealed in the words—unnecessarily create complex questions and can cause persons to forfeit their rights unintentionally." *Adams v. Lever Bros. Co.*, 874 F.2d 393, 395 (7th Cir. 1989). Consistent with this principle, we have rejected previous attempts to characterize an administrative closing as a final order in disguise, *see Penn West*, 371 F.3d at 129, as have other circuits, *see, e.g.*, *Penn-Am. Ins.*, 521 F.3d at 297.[6]

---

[6] The First Circuit has confronted the opposite issue: whether to recharacterize a so-called dismissal order as an administrative closing when the order was not final. *See Lehman*, 166 F.3d at 391–92 (concluding that the district court's order was an administrative closing, despite the label "procedural order of dismissal," because it was not a final judgment that could be corrected under

12

Nor can we say that the closing somehow matured into a final order. To be sure, "a district court can provide, in the text of its order, a built-in timetable under which the administrative closing may automatically expire, or, alternatively, mature into a final decision." *Penn West*, 371 F.3d at 128 (noting that an administrative closing did not become a final order despite the passing of three years). But the court's order in this case contained no such timetable. And even if it had, such orders "are not entirely self executing. [They] must still be entered into the docket before they can be considered final orders of dismissal." *WRS*, 402 F.3d at 428 (citing *United States v. Indrelunas*, 411 U.S. 216, 220 (1973) (per curiam)).

Moreover, PGW misinterprets the District Court's order. Contrary to PGW's suggestion, the order left more "for the court to do [than] execute the judgment." *Catlin*, 324 U.S. at 233. Indeed, by closing the case—rather than dismissing it—the court maintained an implicit supervisory role over the arbitration. This allowed the parties to return to the same courtroom if problems arose during the arbitration—for example, if the proposed arbitrators were unavailable, one of the parties failed to show up for arbitration, or even, as Freeman alleges, the

---

Federal Rule of Civil Procedure 60). That issue is not before us.

13

arbitrator violated 9 U.S.C. § 10(a). To put it another way, the court's order required it to act as a judicial backstop in the event that the arbitration fell apart. This practice is not only permissible but also laudable. When problems arise during arbitration, it often makes sense for the parties to return to a judge who is already familiar with the case. *See Lehman*, 166 F.3d at 392 ("We endorse the judicious use of administrative closings by district courts.").[7]

We conclude that the District Court's order—which closed the case and sent the parties to arbitration—did not deprive the court of jurisdiction. Because the District Court retained jurisdiction, it correctly entered a final order when it denied Freeman's motion to vacate. In turn, we have jurisdiction to consider Freeman's appeal

---

[7] Although the order left more "for the court to do [than] execute the judgment," *Catlin*, 324 U.S. at 233, that conclusion is not necessary to our holding. For the reasons already stated, the District Court would have retained jurisdiction even if the order otherwise resembled a final order. This is consistent with *Kokkonen v. Guardian Life Insurance*, 511 U.S. 375 (1994), which concluded that district courts are free to enforce settlement agreements if they "reserve[d] jurisdiction" to do so. *Id.* at 377, 379. We view administrative closings as a method of reserving jurisdiction.

under 9 U.S.C. § 16(a)(3) ("An appeal may be taken from . . . a final decision with respect to an arbitration that is subject to this title.").

## III

We must also decide whether Freeman waived his "evident partiality" claim under 9 U.S.C. § 10(a)(2). Both sides agree that he failed to raise any concerns during the arbitration proceeding. This suggests that he waived his claim. In his defense, Freeman contends that Lally-Green deceived him and left him unaware of her true relationship with PPG Industries. He argues that he could not bring forth information that had been withheld from him. Whatever the merits of this contention, we will not apply the doctrine of waiver to Freeman's claim because—ironically enough—PGW failed to invoke it in the District Court.

We generally refuse to consider issues that the parties have not raised below. *Singleton v. Wulff*, 428 U.S. 106, 120 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below."). In a recent case, we noted that the appellant "did not raise [its] claim in the Bankruptcy Court," and we refused to "consider new claims for the first time on appeal." *In re Reliant Energy Channelview LP*, 594 F.3d 200, 209 (3d Cir. 2010). As the Supreme Court has pointed out, the doctrine of appellate waiver "is essential in order that parties may have the

15

opportunity to offer all the evidence they believe relevant to the issues." *Hormel v. Helvering*, 312 U.S. 552, 556 (1941).[8]

Despite this general rule, it is within our discretion to consider an issue that the parties did not raise below. *See, e.g., Bagot v. Ashcroft*, 398 F.3d 252, 256 (3d Cir. 2005) ("This Court has discretionary power to address issues that have been waived."). The Supreme Court has explained that doing so is "left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." *Singleton*, 428 U.S. at 121; *see also Chertkova v. Conn. Gen. Life Ins.*, 92 F.3d 81, 88 (2d Cir. 1996). For example, we might consider a waived issue when "the proper resolution is beyond any doubt" or when "injustice might otherwise result." *Singleton*, 428 U.S. at 121 (citations and quotation marks omitted); *see also Kramer v. Gates*, 481 F.3d 788, 791 (D.C. Cir. 2007).

Our Court has yet to explain how waiver applies in

---

[8] The doctrine of appellate waiver should not, of course, be confused with an identically named provision in many plea agreements. *See United States v. Goodson*, 544 F.3d 529, 531 (3d Cir. 2008) (noting that an "appellate waiver" is a provision in plea agreements that "waive[s] [the] right to file a direct appeal").

the arbitration context. PGW asserts that a party waives any partiality claim under the Federal Arbitration Act if the party failed to raise its concerns during arbitration. Other circuits would generally agree. *See, e.g.*, *Fid. Fed. Bank, FSB v. Durga Ma Corp.*, 386 F.3d 1306, 1313 (9th Cir. 2004) (applying waiver to claims under 9 U.S.C. § 10(a)(2)); *JCI Comm'ns v. Int'l Bhd. of Elec. Workers, Local 103*, 324 F.3d 42, 51 (1st Cir. 2003) (same).

That said, most circuits have recognized that a blanket waiver rule is inappropriate. The Sixth Circuit concluded that waiver applies only if the party knew of the facts suggesting bias during the proceeding. *See Apperson v. Fleet Carrier Corp.*, 879 F.2d 1344, 1359 (6th Cir. 1989) (applying waiver only if "[a]ll the facts now argued as to [the] alleged bias were known . . . at the time the [arbitrator] heard their grievances" (quoting *Early v. E. Transfer*, 699 F.2d 552, 558 (1st Cir. 1983))); *cf. United Steelworkers of Am. Local 1913 v. Union R.R. Co.*, 648 F.2d 905, 913 (3d Cir. 1981) (applying a similar rule to a private labor board acting under 45 U.S.C. § 153). The Ninth Circuit extended this rule to situations where the party "has constructive knowledge of a potential conflict but fails to timely object." *Fid. Fed. Bank*, 386 F.3d at 1313 (citing *JCI Comm'ns*, 324 F.3d at 52). The court viewed this as a better approach "in light of [its] policy favoring the finality of arbitration awards." *Id.*

17

The Ninth Circuit's approach has considerable merit: a party waives later challenges only if it "either knew or should have known of the facts indicating partiality." *Id.* This approach allows a party to challenge an arbitration when it had no way of discovering the arbitrator's bias beforehand. At the same time, it encourages investigation by making the parties accountable for information they should have known. Moreover, it prevents the losing party from receiving a second bite at the apple. *See Early*, 699 F.2d at 558 ("[W]e cannot accept that parties have a right to keep two strings to their bow—to seek victory before the tribunal and then, having lost, seek to overturn it for bias never before claimed.").

But we need not adopt any approach today. The doctrine of appellate waiver is not somehow exempt from itself. *See, e.g.*, *United States v. Gibbs*, 626 F.3d 344, 351 (6th Cir. 2010). This means that a party can waive a waiver argument by not making the argument below or in its briefs. A case from the Seventh Circuit is instructive. *United States v. Leichtnam*, 948 F.2d 370 (7th Cir. 1991). There, the district court had improperly admitted two guns into evidence. *Id.* at 380–81. The defendant did not object to the admission of guns at the time, but he later objected on appeal. The Seventh Circuit noted that the defendant likely waived his objection. Yet the court concluded that the government waived any waiver

18

argument by failing to raise the issue "in its brief . . . [or] at oral argument." *Id.* at 375 ("[T]he government has now waived waiver as a defense."). The court thus considered the defendant's objection.

That is similar to the situation here. PGW never presented its waiver argument to the District Court.[9] For that reason, the District Court never decided whether Freeman had waived his challenge to Lally-Green's impartiality. Nor did the court invite the parties to develop the record on the issue. PGW's silence is particularly vexing because, as outlined above, whether Freeman waived his objection likely depends on whether he knew or should have known of the campaign contributions during the arbitration. *See Bagot*, 398 F.3d at 256 (explaining that the applicability of waiver depends on whether "additional fact-finding is necessary"). We are in no position to analyze PGW's fact-dependent waiver argument on appeal.

IV

We now turn to the merits of Freeman's claims. Our review of the District Court's decision not to vacate the arbitration "proceed[s] like [our] review of any other

_____

[9] PGW never mentioned the doctrine of waiver in its response to Freeman's motion to vacate, *see* App. 81 to 8r, or in its motion to strike Freeman's motion to vacate, *see* Supp. App. 91–102.

19

district court decision"—we review its legal conclusions de novo and its factual findings for clear error. *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 947–48 (1995); *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 521 (3d Cir. 2009).

It is rare for us to disturb an arbitration award. We will "vacate [an award] only under [the] exceedingly narrow circumstances" listed in 9 U.S.C. § 10(a). *Dluhos v. Strasberg*, 321 F.3d 365, 370 (3d Cir. 2003); *see also Stolt-Nielsen S.A. v. AnimalFeeds Int'l*, 130 S. Ct. 1758, 1768 n.3 (2010) (suggesting that vacatur also is appropriate to correct a "manifest disregard" of the law either because that standard provides "an independent ground for review" or because it is "a judicial gloss on the enumerated grounds . . . set forth at 9 U.S.C. § 10"). As we have explained, "[w]e do not entertain claims that an arbitrator has made factual or legal errors. Rather, mindful of the strong federal policy in favor of commercial arbitration, we begin with the presumption that the award is enforceable." *Sutter v. Oxford Health Plans LLC*, 675 F.3d 215, 219 (3d Cir. 2012).

V

Freeman claims that Lally-Green was evidently partial in violation of 9 U.S.C. § 10(a)(2). This provision of the Federal Arbitration Act allows courts to vacate an arbitration award "upon the application of any party to the arbitration . . . where there was evident partiality or

corruption in the arbitrators, or either of them." According to Freeman, Lally-Green violated this standard because she failed to disclose two facts: the campaign funds from PPG Industries and her teaching relationship with Mack. We disagree.

A

The first order of business is to define "evident partiality" under the Federal Arbitration Act, 9 U.S.C. § 10(a)(2). Freeman argues that the Act condemns even the appearance of bias. This would mean that the standard for arbitrators is the same as the disqualification standard for federal judges. *See* 28 U.S.C. § 455(a). Under that standard, "what matters is not the reality of bias or prejudice but its appearance." *Liteky v. United States*, 510 U.S. 540, 548 (1994) (interpreting § 455(a)). In response, PGW contends that the "evident partiality" standard is less restrictive.

The confusion over this issue stems from *Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145 (1968). In that alliterative case, Justice Hugo Black wrote a plurality opinion stating that "[w]e can perceive no way in which the effectiveness of the arbitration process will be hampered by the simple requirement that arbitrators disclose to the parties any dealings that might create an impression of possible bias." *Id.* at 149 (plurality). He also remarked that "any tribunal permitted by law to try cases and controversies

21

not only must be unbiased but also must avoid even the *appearance of bias*." *Id.* (plurality) (emphasis added). That language is clear, but only three other justices joined the opinion. Two justices concurred in an opinion by Justice Byron White, and three justices dissented.

When interpreting fractured opinions, we look to the narrowest grounds for judgment. *See Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case . . . the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." (citation and quotation marks omitted)). Justice White's concurrence refused to define "evident partiality" generally. "The Court does not decide today that arbitrators are to be held to the standards of judicial decorum of Article III judges." *Commonwealth Coatings*, 393 U.S. at 150 (White, J., concurring). He instead enunciated a much narrower rule: arbitrators must tell the parties about any "substantial interest [they have] in a firm" that does business with one of the parties. *Id.* at 151–52 (White, J., concurring). Justice White's concurrence is the narrowest grounds for judgment, which means that it is the holding of the Court.[10] It also

---

[10] Although Justice White proclaimed to be "glad to join [ ] Brother Black's opinion," *Commonwealth Coatings*, 393 U.S. at 150 (White, J., concurring), most

22

means that the plurality's discussion of appearances is nonbinding.

And that is how other courts have interpreted *Commonwealth Coatings*. Nearly two decades after the decision, the Second Circuit interpreted the phrase "evident partiality" and declared that it was facing "a relatively clean slate." *Morelite Constr. v. New York City Dist. Council Carpenters Ben. Funds*, 748 F.2d 79, 83 (2d Cir. 1984). It rejected the appearance standard and held "that 'evident partiality' within the meaning of 9 U.S.C. § 10 will be found where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration." *Id.* at 84.

Other courts soon followed the Second Circuit's

courts have concluded that Justice White did not in fact join the plurality opinion—primarily because his analysis is at odds with the plurality's analysis. *See, e.g.*, *Morelite Constr. v. New York City Dist. Council Carpenters Ben. Funds*, 748 F.2d 79, 82–83 (2d Cir. 1984). The Fifth Circuit discussed this issue at length in an en banc opinion and reached the same conclusion. *Positive Software Solutions v. New Century Mortg. Corp.*, 476 F.3d 278, 280–85 (5th Cir. 2007) (en banc). We implicitly agreed with these courts when we adopted the *Morelite* standard in *Kaplan v. First Options of Chicago, Inc.*, 19 F.3d 1503, 1523 n.30 (3d Cir. 1994).

23

lead. *See, e.g.*, *Apperson*, 879 F.2d at 1358 ("We agree with the *Morelite* court's analysis."); *JCI Comm'ns, Inc.*, 324 F.3d at 51; *ANR Coal Co. v. Cogentrix of N.C.*, 173 F.3d 493, 500-01 (4th Cir. 1999); *see also Positive Software Solutions v. New Century Mortg. Corp.*, 476 F.3d 278, 283 (5th Cir. 2007) (en banc) (interpreting "evident partiality" "practically rather than with utmost rigor"). Under this standard, "[t]he alleged partiality must be direct, definite, and capable of demonstration." *Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 329 (6th Cir. 1998). The party asserting bias "must establish specific facts that indicate improper motives on the part of an arbitrator." *Peoples Sec. Life Ins. v. Monumental Life Ins.*, 991 F.2d 141, 146 (4th Cir. 1993).

We embraced this standard in a footnote. *See Kaplan v. First Options of Chi., Inc.*, 19 F.3d 1503, 1523 n.30 (3d Cir. 1994). "[T]o show evident partiality," we explained, "the challenging party must show a reasonable person would have to conclude that the arbitrator was partial to the other party to the arbitration." *Id.* (quoting *Apperson,* 879 F.2d at 1358) (quotation marks omitted)). Although our discussion was abbreviated, we noted that "[e]vident partiality is strong language and requires proof of circumstances powerfully suggestive of bias." *Id.* (quotation marks and citations omitted). We have yet to revisit this standard in a precedential opinion, nor have we explained whether it applies in all cases under the

24

Federal Arbitration Act.

In response to the parties' confusion, we take this opportunity to reaffirm what we said in *Kaplan*. An arbitrator is evidently partial only if a reasonable person would have to conclude that she was partial to one side. *Id.* The conclusion of bias must be ineluctable, the favorable treatment unilateral. *See Andersons*, 166 F.3d at 329 ("The alleged partiality must be direct, definite, and capable of demonstration.").

This standard requires a stronger showing— namely, partiality that is evident—than does the appearance standard, and for good reason. Most importantly, the relevant statutory language indicates that the two standards should be different. *See Zimmerman v. Norfolk S. Corp.*, — F.3d — , 2013 WL 238789, *4 (3d Cir. 2013) ("Statutory interpretation requires that we begin with a careful reading of the text."). The Federal Arbitration Act requires a party to show "evident partiality." 9 U.S.C. § 10(a)(2). The word "evident" suggests that the statute requires more than a vague appearance of bias. Rather, the arbitrator's bias must be sufficiently obvious that a reasonable person would easily recognize it. By contrast, the judicial standard requires recusal if a judge's "impartiality might reasonably be questioned." 28 U.S.C. § 455(a). This language suggests that the judicial inquiry focuses on appearances—"not on whether the judge actually

harbored subjective bias." *In re Antar*, 71 F.3d 97, 101 (3d Cir. 1995).

In addition, parties often select arbitrators precisely because they are industry insiders. Parties want someone who understands their business—even if that person already has some familiarity with the parties and issues. *See Commonwealth Coatings*, 393 U.S. at 150 (White, J., concurring) ("It is often because they are [people] of affairs, not apart from but of the marketplace, that they are effective in their adjudicatory function."); *see also* Lisa Bernstein, *Private Commercial Law in the Cotton Industry: Creating Cooperation Through Rules, Norms, and Institutions*, 99 Mich. L. Rev. 1724, 1728 (2001) ("Arbitrators are selected for their experience in their respective industry and their reputation for integrity and fairness." (quotation marks and citation omitted)). An overly strict appearance standard would exclude some of the most qualified arbitrators.

And unlike litigants in court, parties in arbitration are generally free to choose their own adjudicator. This choice occurs either when the parties initially enter a contract or when a dispute later arises. If the parties are willing to proceed in the face of apparent bias, they should be free to do so. *See Commonwealth Coatings*, 393 U.S. at 151 (White, J., concurring) (noting that "parties [ ] are the architects of their own arbitration process"). To be sure, the Federal Arbitration Act does

26

not allow parties to proceed in the face of actual bias. The assumption is that anyone who selected a partial arbitrator likely held the mistaken belief that the arbitrator was in fact impartial. *Cf.* Restatement (Second) of Contracts § 153 (1981) (stating that parties may void contracts in certain instances of unilateral mistake).

Finally, the standard for judges is meant "to protect the public's confidence in the judiciary." *Antar*, 71 F.3d at 101. Although the public's confidence in private arbitration is worth protecting, it is comparatively less important than confidence in the judiciary. *See Morelite*, 748 F.2d at 83–84 (noting that while the judiciary's appearance standard is too restrictive in arbitration cases, "we must not abjure our responsibility to maintain the integrity of the federal courts' role in affirming or vacating awards"). All of this counsels in favor of the relaxed standard that we announced in *Kaplan*.

Freeman nevertheless argues that *Kaplan* applies only to so-called actual-bias cases (where the relevant facts were known and objected to beforehand), not to nondisclosure cases (where the relevant facts were not disclosed). We see no reason to adopt a different standard for each type of case. The Federal Arbitration Act does not distinguish between actual-bias and nondisclosure cases—instead, it condemns "evident partiality" in all cases. 9 U.S.C. § 10(a)(2). And *Kaplan* is sufficiently

27

flexible to accommodate the vagaries of each case. Accordingly, we join the Sixth Circuit in applying this standard in nondisclosure cases. *See Nationwide Mut. Ins. v. Home Ins.*, 429 F.3d 640, 644–45 (6th Cir. 2005).

In a last-ditch effort to avoid our standard, Freeman invokes the rules of the American Arbitration Association. Specifically, he cites Employment Arbitration Rule 12b(ii), which states that "[n]eutral arbitrators serving under these rules . . . shall have no relation . . . to the parties or their counsel that may create an *appearance of bias*" (emphasis added). That rule, however, does not govern our review. We are not at liberty to jettison the words of Congress in favor of a third-party standard. *See Merit Ins. v. Leatherby Ins.*, 714 F.2d 673, 680 (7th Cir. 1983) ("Although we have great respect for the Commercial Arbitration Rules and the Code of Ethics for Arbitrators, they are not the proper starting point for an inquiry into an award's validity . . . . The arbitration rules and code do not have the force of law."). We therefore reject the appearance standard.

B

The previous section defined the relevant standard: an arbitrator is evidently partial only if a reasonable person would necessarily conclude that the arbitrator was partial to one side. *See Kaplan*, 19 F.3d at 1523 n.30. Now we must apply that standard to the case before us. Freeman's claim ultimately fails because no reasonable

28

person would conclude that Lally-Green was partial to PGW.

Freeman cites two supposed nondisclosures as evidence of Lally-Green's partiality. First, she received $4,500 in campaign funds from PPG Industries—the minority owner of PGW—and its top-level employees. Second, she taught a seminar on labor law with Mack, PPG Industries' senior employment attorney. The parties disagree whether she mentioned her relationship with Mack. In any event, they agree that she said nothing about the campaign contributions beyond her acknowledgment that she "knew some people at PPG [Industries]." App. 5f.

We know of no other federal court that has considered whether undisclosed election funds are proof of "evident partiality." For that matter, no federal court has considered whether they create an appearance of bias under the heightened judicial standard—perhaps because federal judges do not run for office. *Cf. Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 884 (2009) (noting that under the Due Process Clause, "[n]ot every campaign contribution by a litigant or attorney creates a probability of bias that requires a judge's recusal"). Even so, a variety of state courts have addressed these issues. With few exceptions, they have concluded that undisclosed election support does not establish "evident partiality," *see DeBaker v. Shah*, 533 N.W.2d 464, 468–70 (Wis.

29

1995), nor does it create an appearance of bias, *see, e.g.*, *Adair v. State, Dep't. of Educ.*, 709 N.W.2d 567, 579 (Mich. 2006).

We reach the same conclusion. The contributions from PPG Industries do not establish "evident partiality," and the reasons are many. First of all, Lally-Green's campaign funds are a matter of public record. In fact, PGW was able to view all contributions to her campaign after a five-minute internet search. We are unable to fault Lally-Green for not disclosing information that was readily available to the public. She may have assumed that the parties already knew about the funds. *See DeBaker*, 533 N.W.2d at 469 ("Because the information is public, there can be no allegation that [the arbitrator] intended to somehow hide the fact that he had received contributions from attorneys associated with the [party's] law firm.").

Moreover, the contributions from PPG Industries are relatively small—far less than 1 percent of the $1.7 million that she raised during her campaign. *Compare id.* (concluding that the arbitrator was not evidently partial when the contributions he received from the party's attorney "were relatively small"), *with Caperton*, 556 U.S. at 884–85 (concluding that the Due Process Clause required a judge's recusal when the defendant's chairman had provided the judge with more than half of his campaign funds at a time when the defendant's case was

30

imminent). And under Pennsylvania law, Lally-Green could not directly solicit funds during her bid. Instead, she had to "establish [a] committee[] of responsible persons to secure . . . funds for [her] campaign." Pa. Code of Jud. Conduct, Canon 7(B)(2). As a result, the money does not at all suggest that Lally-Green had a close relationship with PPG Industries. Add to that PPG Industries' status as a minority owner of PGW, and we fail to see any hint of bias that is "direct, definite, and capable of demonstration." *Andersons*, 166 F.3d at 329.

It also bears repeating that Lally-Green received a fivefold contribution from the law firm representing Freeman. This undercuts Freeman's "evident partiality" claim because our standard requires evidence that Lally-Green was partial to PGW in particular. *See Kaplan*, 19 F.3d at 1523 n.30 ("[T]he challenging party must show a reasonable person would have to conclude that the arbitrator was partial *to the other party*." (emphasis added) (citation and quotation marks omitted)). A reasonable person would not know which side Lally-Green might be likely to favor. Freeman tries to downplay his firm's contribution by drawing a distinction between parties and attorneys. We find the distinction unconvincing. Whether an arbitrator favors a party or its attorneys, the harm to the other party is no less real.

Finally, we note that campaign contributions are a way of life in many state judicial systems. Putting aside

31

the wisdom of popular elections for judicial office, "to conclude that an arbitrator demonstrates evident partiality simply based on non-disclosure of [ ] publicly recorded and relatively small political campaign contributions would impose too great a burden on the system." *DeBaker*, 533 N.W.2d at 469; *see also Adair*, 709 N.W.2d at 579 ("[T]here is no justice in Michigan in modern times who has not received campaign contributions from such persons."); *Dean v. Bondurant*, 193 S.W.3d 744, 747 (Ky. 2006) (Roach, J., sitting alone) ("[U]nder Kentucky's campaign election finance system, it is obvious, even expected, that lawyers will make most of the contributions to judicial candidates.").

As for Lally-Green's teaching relationship, we conclude that it too fails to show "evident partiality"— even if we accept Freeman's claim that she did not disclose the relationship beforehand. By itself, a professional relationship with a party's minority owner is not "powerfully suggestive of bias." *Kaplan*, 19 F.3d at 1523 n.30 (citation and quotation marks omitted). Nor is it a specific fact "that indicate[s] improper motives on the part of an arbitrator." *Peoples Sec.*, 991 F.2d at 146; *see also Uhl v. Komatsu Forklift Co.,* 466 F. Supp. 2d 899, 907–08 (E.D. Mich. 2006). The Federal Arbitration Act requires more than suppositions based on mutual familiarity. In fact, Justice White's concurrence in *Commonwealth Coatings* "fully envisions upholding

32

awards when arbitrators fail to disclose insubstantial relationships." *Positive Software*, 476 F.3d at 281–82 (citing *Commonwealth Coatings*, 393 U.S. at 152 (White, J., concurring)); *Montez v. Prudential Sec.,* 260 F.3d 980, 984 (8th Cir. 2001); *cf. Clemens v. U.S. Dist. Court for Cent. Dist. of Cal.*, 428 F.3d 1175, 1180 (9th Cir. 2005) ("[M]andatory disqualification of a single judge [under § 455(a)] is not warranted simply because of a professional relationship with a victim.").

We see no reason to vacate the arbitration. In hindsight, it might have been preferable for Lally-Green to disclose more about her relationship with PPG Industries. *See Commonwealth Coatings*, 393 U.S. at 151 (White, J., concurring) ("[I]t is far better that the relationship be disclosed at the outset, when the parties are free to reject the arbitrator . . . than to have the relationship come to light after the arbitration, when a suspicious or disgruntled party can seize on it as a pretext for invalidating the award."). Even so, Lally-Green's failure to say more does not establish "evident partiality" under 9 U.S.C. § 10(a)(2).

## VI

Freeman also claims that Lally-Green fraudulently induced the arbitration agreement. Lally-Green told the parties that she "knew some people at PPG [Industries]." App. 5f. According to Freeman, this partial disclosure concealed the true nature of her relationship with PPG

Industries. He thus asserts that the arbitration agreement is voidable and that the arbitration is invalid. This claim is more than a stretch.

In general, an innocent party can void a contract induced by fraud. *See In Re Allegheny Int'l*, 954 F.2d 167, 178 (3d Cir. 1992). This doctrine applies with equal force to arbitration agreements—the defrauded party can void the agreement and pursue its claims in court. *See Rent-A-Center v. Jackson*, 130 S. Ct. 2772, 2776, 2778 (2010) ("Like other contracts, [arbitration agreements] may be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability." (citation and question marks omitted)).

Freeman's claim differs from the run-of-the-mill fraudulent-inducement claim. In most cases, a party to the agreement alleges that *the other party* fraudulently induced the agreement. *See, e.g.*, *Wash. Mut. Fin. Group, LLC v. Bailey*, 364 F.3d 260, 265 (5th Cir. 2004). In this case, however, Freeman alleges that *the arbitrator* induced her selection through deceit. The Federal Arbitration Act certainly allows courts to vacate an arbitration if "the award was procured by corruption, fraud, or undue means." 9 U.S.C. § 10(a)(1). And it allows courts to do the same if "there was . . . corruption in the arbitrators." *Id.* § 10(a)(2). So Freeman is correct that we can vacate an arbitration if the arbitrator's fraud led to her selection.

34

Freeman's problem is that he must prove fraud in the inducement. Under Pennsylvania law, such claims have six elements:

> (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

*EBC, Inc. v. Clark Bldg. Sys.*, 618 F.3d 253, 275 (3d Cir. 2010) (quoting *Skurnowicz v. Lucci*, 798 A.2d 788, 793 (Pa. Super. Ct. 2002)). Pennsylvania law also requires proof of each element by "clear and convincing evidence." *Id.*

Freeman fails miserably in his effort to satisfy these elements. We begin with the fourth: "intent [to] mislead[] another." *Id.* As noted above, Lally-Green was unable to solicit funds directly. *See* Pa. Code of Jud. Conduct, Canon 7(B)(2). She might have been unaware that PPG Industries contributed to her campaign. And even if she knew of the contributions, she might have assumed that the parties were similarly aware. That is enough to defeat the element of intent.

35

Most grievously, Freeman does not even try to show that his "injury was proximately caused by [his] reliance." *EBC*, 618 F.3d at 275. The only injury that Freeman alleges is that he lost at arbitration. This makes causation difficult to prove. Freeman must show that his discrimination claim would have succeeded in front of a different arbitrator. In effect, he has the "turducken task" of proving his discrimination claim within his fraud claim, *F.T.C. v. Watson Pharmaceuticals*, 677 F.3d 1298, 1315 (11th Cir. 2012), much like plaintiffs must do in legal malpractice suits, *Dixon Ticonderoga Co. v. Estate of O'Connor*, 248 F.3d 151, 175 (3d Cir. 2001) (noting "the case-within-a-case phenomenon that often arises in professional malpractice litigation"). Because Freeman makes no attempt to establish the elements of his discrimination claim, his fraud claim must fail.

\* \* \*

For these reasons we will affirm the District Court's order denying Freeman's motion to vacate.

36