# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued February 9, 2017            Decided March 31, 2017

No. 16-7083

BELIZE BANK LIMITED,
APPELLEE

v.

GOVERNMENT OF BELIZE,
APPELLANT

Consolidated with 16-7089, 16-7094

Appeals from the United States District Court
for the District of Columbia
(No. 1:14-cv-00659)

*Juan C. Basombrio* argued the cause for the appellant. *Creighton R. Magid* was with him on brief.

*Mahesha P. Subbaraman* and *Janet C. Evans* were on brief for the *amicus curiae* Professor Richard W. Painter in support of the appellant Government of Belize.

*Louis B. Kimmelman* argued the cause for the appellee. *Dana C. MacGrath* and *Ryan C. Morris* were with him on brief.

Before: GARLAND, *Chief Judge*, and HENDERSON and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: On January 15, 2013, an arbitral tribunal in London, England, found the Government of Belize (Belize) in breach of a settlement agreement with The Bank of Belize Limited (Bank). The tribunal therefore ordered Belize to pay the Bank a substantial monetary award. After attempts to enforce the award in Belize failed, the Bank commenced this action in the district court, asking the court to confirm the arbitral award and enter judgment in its favor. In a well-reasoned order, the district court granted the Bank's petition. *Belize Bank Ltd. v. Gov't of Belize*, 191 F. Supp. 3d 26 (D.D.C. 2016).

On appeal, Belize raises multiple challenges to the district court's judgment. We have accorded each of Belize's arguments "full consideration after careful examination of the record," *Bartko v. SEC*, 845 F.3d 1217, 1219 (D.C. Cir. 2017) (quoting *Ozburn-Hessey Logistics, LLC v. NLRB*, 833 F.3d 210, 213 (D.C. Cir. 2016)), but find them either largely asked and answered by Circuit precedent, *see BCB Holdings Ltd. v. Gov't of Belize*, 650 F. App'x 17 (D.C. Cir. 2016) (per curiam); *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 794 F.3d 99 (D.C. Cir. 2015); *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724 (D.C. Cir. 2012), or otherwise properly resolved by the district court. Only one issue raised by Belize warrants further discussion—whether the district court's enforcement of the arbitral award violated the New York Convention because it was "contrary to the public policy of" the United States. Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 ("New York Convention"), art. V(2)(b), 21 U.S.T. 2517, T.I.A.S. 2517, T.I.A.S. No. 6997,

330 U.N.T.S. 3 (1970); 9 U.S.C. § 207. For the reasons that follow, we believe the district court judgment is consistent with the New York Convention and therefore affirm.

## I. Background[1]

On December 9, 2004, Said Musa, the Prime Minister of Belize, signed a confidential agreement under which Belize agreed to serve as the guarantor of a loan made to a Belizean health services provider by the Bank. By 2007, that health services provider was in default, making Belize liable for the outstanding loan balance. Pursuant to a March 23, 2007 settlement agreement, Belize agreed to pay the debt in full. Shortly thereafter, the settlement agreement became public knowledge and a firestorm erupted—protesters, branding the deal corrupt, marched on the Belizean capital; and Belizean public interest groups, believing that Prime Minister Musa lacked the authority to financially bind Belize without the approval of the Belizean National Assembly, challenged the settlement agreement in the Belizean court. Responding to the pressure, Belize refused to make any payment pursuant to the settlement agreement with the Bank.

Following Belize's default, the Bank—in accordance with a dispute resolution clause included in the settlement agreement—began arbitration proceedings against Belize in London, England, under the Rules of the London Court of International Arbitration (LCIA). The arbitral tribunal overseeing the proceedings was to consist of three members, one appointed by each party and the third appointed jointly by the two parties' members. Because Belize largely declined to

---

[1] The facts herein set forth are only those relevant to the remaining issue before us. More complete details of the case are set forth in *Belize Bank Ltd.*, 191 F. Supp. 3d 26, 30-40 (D.D.C. 2016).

participate in the early stages of the arbitration, however, the LCIA had to step in and appoint Belize's arbitrator in Belize's stead.[2] The LCIA nominated Zachary Douglas as Belize's member of the arbitral tribunal.

In March 2012, five years after Douglas's initial appointment, Belize challenged Douglas's continued service on the arbitral tribunal. Belize argued that another member of the English chambers Douglas belonged to, Matrix Chambers, had—in previous unrelated matters—advised a partial owner of the Bank and represented other interests adverse to Belize. Belize questioned Douglas's impartiality as a member of the arbitral tribunal and argued that Douglas had a duty to disclose information detailing Matrix Chambers's practices and representations, or, alternatively, that Douglas should be removed from the arbitral panel.

The LCIA then created a three-member "Division" to consider Belize's challenges. *Belize Bank Ltd. v. Gov't of Belize*, Case No. 81116 (London Ct. Int'l Arb. 2012). The Division rejected both of Belize's alternatives. *Id.* at 11-18. Analyzing the disclosure issue, the Division relied on the "British Rule," under which barristers in the same chambers— unlike lawyers in a traditional American law firm—are presumed to be independent practitioners. *Id.* at 14 ("Barristers are sole practitioners. Their Chambers are not law firms."). Although the Division recognized that "chambers ought not to be used as a shield to preclude a fact-based inquiry as to whether a justifiable doubt [as to impartiality or independence] may be raised by barristers from the same chambers acting as arbitrator and party counsel in the same proceeding," it found that Douglas's alleged conflict of interest was too attenuated to

---

[2] Such appointment in place of an absentee or non-performing party is permitted by LCIA rules.

give rise to a duty to disclose. *Id.* at 15. ("There is no suggestion . . . that any barrister from Matrix Chambers, other than Professor Douglas, has acted in the present proceeding."). Although the Division recognized that no "hard-and-fast" rule existed that excused a barrister's disqualification based on the activities of another barrister belonging to the same chambers, it determined that the "totality of the relevant circumstances in this case" weighed against Douglas's disqualification in that Douglas himself had not acted for or against Belize or the Bank in the past, no barrister in Matrix Chambers (other than Douglas) was acting for or against the Bank or Belize in the arbitral proceeding before the LCIA and Belize had notice of the fact that barristers in the same chambers are independent practitioners. *Id.* at 17.

Belize did not take the Division's adverse decision well, withdrawing from the arbitration proceedings and refusing to participate thereafter. Nonetheless, the proceedings continued and, on January 15, 2013, the arbitral tribunal found Belize in breach of its settlement agreement with the Bank. The tribunal ordered Belize to pay the Bank the sum of BZ\$36,895,509.46, plus interest at 17%, compounded on a monthly basis from September 8, 2012, until the date of payment.

On April 18, 2014, the Bank filed a Petition to Confirm Foreign Arbitration Award and to Enter Judgment in district court. The district court granted the petition, concluding, *inter alia*, that enforcement of the award in the United States was not contrary to United States public policy under New York Convention Article V(2)(b).[3] *Belize Bank Ltd.*, 191 F. Supp. 3d at 38.

---

[3] To the extent Belize argues that the district court did not expressly determine that enforcement of the arbitral award was consistent with United States public policy, we disagree. *See*

## II. Analysis

The New York Convention is part of a "carefully crafted framework for the enforcement of international arbitration awards." *Belize Social Dev. Ltd.*, 668 F.3d at 729 (quotation omitted). It is "clear that when an action for enforcement is brought in a foreign state, the state may refuse to enforce the award only on the grounds explicitly set forth in Article V of the Convention." *TermoRio S.A. E.S.P.* v. *Electranta S.P.*, 487 F.3d 928, 935 (D.C. Cir. 2007) (quoting *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 23 (2d Cir. 1997)). Article V(2)(b), in turn, states that "[r]ecognition and enforcement of an arbitral award may . . . be refused if the competent authority in the country where recognition and enforcement is sought finds that . . . [t]he recognition or enforcement of the award would be contrary to the public policy of that country." New York Convention art. V(2)(b).

In *TermoRio*, we recognized that Article V(2)(b) does not require a fly-specking of the ABA Model Rules of Professional Conduct. *See* 487 F.3d at 938 ("[C]ourts have been very careful not to stretch the compass of 'public policy.'"). Rather, with

---

Appellant's Br. 39. Belize correctly notes that the relevant issue is not whether "the [LCIA] Division's decisions rejecting Belize's challenges to the arbitral panel were well reasoned and consistent with the LCIA's Rules" but is instead "whether there is a U.S. public policy against enforcement of [the] arbitral award[.]" *Id.* The district court concluded that "nothing about the selection process of the arbitrators in this case . . . would offend *United States public policy*." *Belize Bank Ltd.*, 191 F. Supp. 3d at 38 (emphasis added). As we explain *infra*, Douglas's participation did not violate the United States' "most basic notions of morality and justice." *TermoRio S.A. E.S.P.* v. *Electranta S.P.*, 487 F.3d 928, 938 (D.C. Cir. 2007) (quotation omitted); *see infra* Part II.

appropriate deference to other sovereign nations, the "public policy defense is to be construed narrowly to be applied only where enforcement would violate the [United States'] most basic notions of morality and justice." *Id.* (quoting *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 306 (5th Cir. 2004)); *see also Enron Nigeria Power Holding, Ltd. v. Fed. Republic of Nigeria*, 844 F.3d 281, 288 (D.C. Cir. 2016) (internal quotation marks omitted) ("[T]he question of public policy is ultimately one for resolution by the courts, and thus, if enforcement of the Award based on [an arbitrational panel's] interpretation of [a contract] violates a public policy of the United States . . . then the district court [is] obligated to refrain from enforcing it."). Because Belize challenges enforcement of the arbitral award, it "bears the burden of proof" of meeting this exacting standard. *Karaha Bodas*, 364 F.3d at 288.

Belize insists that the LCIA's failure to disqualify—or require certain disclosures from—Douglas created an unacceptable appearance of impartiality viewed through the lens of United States public policy. *See* Appellant's Br. 39-43; *see also* Amicus Br. 15-19. That is, Belize claims that, "if the rules applicable to U.S. law firms were applied to Douglas and Matrix Chambers," it would be "undisputed that bias and a lack of impartiality" tainted the arbitral tribunal so long as Douglas was a member. Appellant's Br. 41. To bolster its claim, Belize highlights Justice White's concurring opinion in *Commonwealth Coatings Corp. v. Continental Causality Co.*, wherein he noted that "where the arbitrator has a substantial interest in a firm which has done more than trivial business with a party, that fact must be disclosed." 393 U.S. 145, 151-52 (1968) (White, J., concurring); *see also Positive Software Sols., Inc. v. New Century Mortg. Corp.*, 476 F.3d 278 (5th Cir. 2007); *Schmitz v. Zilveti*, 20 F.3d 1043 (9th Cir. 1994). Because Douglas belonged to Matrix Chambers and a member of Matrix

Chambers had previously done more than trivial business with the Bank and against Belize, Belize argues that the LCIA's failure to disqualify or require disclosure from Douglas ran afoul of *Commonwealth Coatings* and its progeny [4] and therefore enforcement of the LCIA's award violates United States public policy.

We disagree. The cases upon which Belize relies address a provision of the Federal Arbitration Act (FAA) that permits a district court to vacate a domestic arbitration award "where there was evident partiality or corruption in the arbitrators." 9 U.S.C. § 10(a)(2). For the reasons set forth below, Belize has failed to allege conduct that would warrant denial of enforcement under our cases interpreting that standard. But even if the alleged conduct did satisfy the FAA standard, we would be unable to deny enforcement in this case. As we have explained above, we may refuse to enforce this international arbitration award "only on the grounds explicitly set forth in Article V" of the New York Convention, *TermoRio*, 487 F.3d

---

[4] In *Commonwealth Coatings*, Justice Black, joined by three other justices, declared that "any tribunal permitted by law to try cases and controversies not only must be unbiased but also must avoid even the appearance of bias." 393 U.S. at 150. Justice White concurred in an opinion joined by Justice Marshall, advancing a narrower rule: "arbitrators must tell the parties about any 'substantial interest [they have] in a firm' that does business with one of the parties." *Freeman v. Pittsburgh Glass Works, LLC*, 709 F.3d 240, 252 (3d Cir. 2013) (citing 393 U.S. at 151-52). Three justices dissented. 393 U.S. at 152. "Justice White's concurrence is the narrowest grounds for judgment, which means that it is the holding of the Court . . . [and] that the plurality's discussion of appearances is nonbinding." *Freeman*, 709 F.3d at 252; *see Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case . . . the holding of the Court may be viewed as the position taken by those Members who concurred in the judgements on the narrowest grounds." (citation and quotation marks omitted)).

at 935, and the only potentially relevant ground is that enforcement of the arbitration award "would be contrary to the public policy of [the United States]," New York Convention art. V(2)(b). As we have also explained, this requires Belize to show that Douglas's participation in the arbitration violated this country's "most basic notions of morality and justice." *TermoRio*, 487 F.3d at 938. It has not done so.

As an initial matter, Article V(2)(b)'s requirement that we replace foreign *ethical* standards with United States public policy in scrutinizing an arbitral award, *see* New York Convention art. V(2)(b) (authorizing forum state to refuse enforcement of arbitral award if it "would be contrary to the public policy of *that country*" (emphasis added)), does not give us license to replace the *facts* of a case with an Americanized version thereof. Contrary to Belize's description, Matrix Chambers is *not* a law firm—it is an English chambers.[5] As the

---

[5] Belize argues that because Matrix Chambers "marketed itself as a collaborative venture," we should equate Matrix Chambers with an American law firm (rather than an English chambers). Appellant's Br. 32-34. Belize insists that "Matrix [Chambers] does not act as independent practitioners; thus the British Rule should not apply." *Id.* English courts have stated, however, that they are "aware of *no case* in which a problem has arisen due to the improper transmission of information between members of chambers." *Laker Airways Inc. v. FLS Aerospace Ltd. & Stanley Burton*, [1999] QB 45 at 53 (Eng.) (emphasis added). Although Matrix Chambers's promotional material discusses its "collaborative" approach and centralized organizational structure, there is no indication that individual barristers within Matrix Chambers share client confidences; in fact, the promotional material expressly states that Matrix Chambers is composed of "individual practitioners with a professional obligation to promote the interests of [their] clients . . . ." JA 621. Douglas himself reinforced this view, noting that "it would be a breach of a barrister's obligation of confidentiality" to share client information; and further, he had "never inquired as to the practice of other

LCIA correctly noted, an English chambers is composed of independent solo practitioners housed together and operating under a common name, a structure vastly different from an American law firm in which, *inter alia*, confidential client information—as well as assets and liabilities—are shared among partners. *Belize Bank Ltd.*, Case No. 81116, at 17 ("Barristers are sole practitioners. Their Chambers are not law firms."); *see also Laker Airways Inc. v. FLS Aerospace Ltd. & Stanley Burton* [1999] QB 45 at 52 (Eng.) ("[P]racticising barristers are prohibited by the rules of their profession from entering partnerships or accepting employment . . . ."). Thus, we find the case law relied on by Belize, which details ethical concerns underlying *firm*-wide imputation of conflicts of interest, inapposite even if a violation of United States' domestic arbitration requirements under the FAA were sufficient to satisfy Article V(2)(b). That case law is premised on "the presumption that 'associated' attorneys share client confidences." *Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 133 (2d Cir. 2005); *Commonwealth Coatings*, 393 U.S. at 151 (White, J., concurring) (analyzing arbitrator's interest "*in a firm*" (emphasis added)). In weighing Douglas's alleged conflicts, the LCIA invoked the British Rule *not* based on moral and ethical *values* different from those held here in America; the LCIA simply addressed a different *model*—a different type of legal practice—from the American model.

In order to set aside an award under the FAA's "evident partiality" standard, the party challenging the award must "establish[] specific facts that indicate improper motives on the part of the arbitrator." *Al-Harbi v. Citibank, N.A.*, 85 F.3d 680, 683 (D.C. Cir. 1996). We believe an allegation that an arbitral

members of Matrix Chambers and [was] under no obligation to do so." JA 594.

tribunal member is a member of the same *chambers* as another barrister who, in proceedings unrelated in fact and time, represented a conflicting interest, is insufficient to meet that burden, let alone to demonstrate that enforcement would violate the United States' "most basic notions of morality and justice" as required to set aside an award under the New York Convention. *TermoRio*, 487 F.3d at 938. First, "barristers are all self-employed . . . precisely in order to maintain the position where they can appear against or in front of one another." *Laker Airways*, [1999] QB 45 at 52; *accord* Stephan Landsman, *The Servants*, 83 MICH. L. REV. 1105, 1106-07 (1985) ("Although barristers must join a set of chambers, each is considered a sole practitioner and is prohibited from entering into any partnership arrangements. Each must develop and sustain his or her own practice." (footnote omitted)). Because the chambers model is designed to protect a barrister's independence—a fact acknowledged by English courts, *see Laker Airways*, [1999] QB at 52 (rule "prevent[ing] barristers at the same chambers from appearing against one another . . . has never been recognized, and the contrary practice is an every day occurrence in the [English] Courts"), and scholars, *see* Landsman, *supra* at 1106-07—we are aware of no ethical rule that would require conflict imputation in these circumstances. Without more, a perceived conflict arising from another barrister's practice does not give rise to the *Commonwealth Coatings* duty to disclose or otherwise create an appearance of impropriety.[6] *See* 393 U.S. at 151-52 (White, J., concurring).

---

[6] Indeed, we have already limited *Commonwealth Coatings* in similar circumstances. In *Al-Harbi v. Citibank, N.A.*, 85 F.3d 680 (D.C. Cir. 1996), we held that "the fact that [an arbitrator's] *former* law firm had represented [one of the parties] on matters unrelated to the mediation or the underlying dispute" gave rise to only a "marginally disclosable" conflict under *Commonwealth Coatings*, a conflict that did not require the arbitrator to conduct any further investigation. *Id.* at 682-83. Likewise, here, the events causing the

Second, we cannot say that Douglas's membership in Matrix Chambers threatened "[t]he arbitration process['s] . . . amicable and trusting atmosphere." *Id*. at 151. Granted, "insistence on the appearance of neutrality" is vital to "ensuring the reality of fair adjudication." *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1909 (2016). At the same time, however, questions about appearance are resolved from the perspective of the parties. *See Matter of Andros Compania Maritima, S.A. (Marc Rich & Co., A.G.)*, 579 F.2d 691, 700 (2d Cir. 1978) (considering "*Commonwealth Coatings* principle of disclosure" for arbitrator conflicts applicable only to information "of which *the parties* cannot reasonably be expected to be aware" (emphasis added)); *see Freeman v. Pittsburgh Glass Works, LLC*, 709 F.3d 240, 253 (3d Cir. 2013). As the LCIA noted, the "chambers system of barristers acting as independent practitioners" was "familiar" to Belize based on Belize's historical association with the British justice system[7] and the fact that, in an earlier proceeding involving Belize, Matrix Chambers barristers appeared on opposing sides

---

purported conflicts occurred in 1994 and 2001, before Douglas joined Matrix Chambers in 2006; Belize has alleged no potentially conflict-creating event that occurred contemporaneously with Douglas's membership in Matrix Chambers. In the "arms-length" chambers context, Douglas's alleged conflict is more attenuated. *See supra* at 4.

[7] "Belize is a former British colony and, even after independence in 1981, the [British] Privy Council remained its final court of appeal until 2010. [Belize] has instructed English barristers to represent it in appeals before the Privy Council . . . ." *Belize Bank Ltd. v. Gov't of Belize*, Case No. 81116, at 17 (London Ct. Int'l Arb. 2012).

of the *same* appeal with no objection from Belize. *Belize Bank Ltd.*, Case No. 81116, at 17.

Considered together, these factors demonstrate that enforcement of the LCIA arbitral award would not violate the United States' most basic notions of morality and justice. *TermoRio*, 487 F.3d at 938.

For the foregoing reasons, the judgment of the district court is affirmed.

*So ordered.*