# United States Court of Appeals
## For the First Circuit

No. 02-2220

JCI COMMUNICATIONS, INC., d/b/a NETVERSANT-NEW ENGLAND,

Plaintiff, Appellant,

v.

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 103,

Defendant, Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Rya W. Zobel, U.S. District Judge]

Before

Lynch, Circuit Judge,
Stahl, Senior Circuit Judge,
and Howard, Circuit Judge.

Andrew C. Pickett, with whom Richard W. Paterniti and
Jackson Lewis LLP were on brief, for appellant.

Indira Talwani, with whom Ira Sills and Segal, Roitman &
Coleman were on brief, for appellee.

March 31, 2003

**LYNCH**, **Circuit Judge**.  JCI Communications, Inc., doing business as NetVersant-New England, is a telecommunications company specializing in network infrastructures.  It signed collective bargaining agreements at various times with Local 2222 and Local 103, two separate locals of the same international union, the International Brotherhood of Electrical Workers ("International").  JCI found itself in the cross-fire as to which work assignments belonged to which local.  After JCI assigned certain work to Local 2222, Local 103 referred a grievance to arbitration in January 2002.  Local 103 prevailed at arbitration.  JCI filed suit to vacate the arbitral award; Local 103 cross-claimed for confirmation and sought summary judgment.  The district court granted summary judgment to Local 103 and JCI appealed.  We affirm.

JCI raises several arguments.  Its two main attacks on the judgment are (1) a set of arguments going to the role played by a Jurisdictional Agreement (purportedly between Locals 103 and 2222, the International, and JCI) and (2) a claim that the arbitrators were biased.  As to the first attack, JCI argues that, despite the arbitral award, it was entitled to a trial, following discovery, on the issue of whether the Jurisdictional Agreement governs the relationship between the parties.  It also argues that the arbitrators exceeded the scope of their authority when they considered the validity and effect of the Jurisdictional Agreement, and so the district court erred in not vacating the award under 9

U.S.C. § 10(a)(4) (2000). Second, JCI argues that the industry arbitrators were biased because they worked for JCI's competitors and so the award should have been vacated under 9 U.S.C. § 10(a)(2). A common theme runs through all the arguments: that JCI wishes to present new evidence or argument to the court to undermine the arbitral award. There are very narrow circumstances in which such a maneuver is permissible; those circumstances are absent here.

The arguments relating to the Jurisdictional Agreement fail for a number of reasons. The district court could not independently review the role of the Jurisdictional Agreement because JCI submitted that issue to the arbitral panel and did not reserve the issue or contest the panel's authority. JCI may not, then, attempt to get discovery or retry the issue to the court. The district court properly confined itself to a review of the panel's award and to the record before the arbitrator; it succinctly and correctly found no basis for the claim that the arbitrators exceeded their authority.

As to the bias claim, while a court may, in other circumstances, take independent evidence on bias, the district court was correct to reject this claim. Here, JCI was on notice that the panel would be drawn from members of its own and related industries and, as a result, that some of JCI's competitors could be the employer representatives on the panel. Yet JCI neither

inquired about the backgrounds of the arbitrators nor raised the question of possible bias before the arbitral panel. Mere participation by arbitrators from the same industry as a party does not present a facial claim of "evident partiality" under § 10(a)(2). JCI has not preserved any claim of bias.

## I.

JCI has hired members of both Local 103 and Local 2222 since at least 1993, when members of both Locals did electrical work at the same project site. JCI entered into a succession of collective bargaining agreements (CBAs) with the Locals between 1993 and 2002, and signed the Jurisdictional Agreement in 1998.

JCI entered into its first CBA with Local 2222 in 1993. That agreement expired and JCI entered into another CBA with Local 2222 that was in force from January 1, 1998 to December 31, 1999.[1] JCI and Local 2222 did not sign another CBA until May 15, 2002, more than three months after the unfavorable arbitral award.

JCI assented in 1998 to a CBA concluded in 1997 between an employers association and Local 103. In March 1998, the business manager of Local 103 wrote to the President of JCI promising to "continue to work with Local 2222 in order to

---

[1] JCI claims in its Petition to Vacate that the January 1, 1998 CBA was "automatically renewed on December 31, 1999." However, the text of that CBA provides that extensions be in writing, and signed by duly authorized representatives of the parties. JCI has not provided any such signed agreement (apart from the new CBA entered into on May 15, 2002).

formalize a jurisdictional agreement." On October 1, 1998, JCI and Local 103 executed a Letter of Assent in which JCI recognized the Boston Chapter of the National Electrical Contractors Association ("Boston Chapter") as JCI's collective bargaining representative "for all matters contained in or pertaining to [the] current and any subsequent approved Telecommunications [L]abor [A]greement between the Boston Chapter, N.E.C.A. and Local Union 103, IBEW." (emphasis added). The Letter was to "remain in effect until terminated by the undersigned employer [JCI]" with adequate written notice to the Boston Chapter and Local 103. JCI never provided written notice of termination to Local 103.

The then-current Telecommunications Labor Agreement, signed on September 1, 1997, expired on February 29, 2000 and was replaced by a succeeding Telecommunications Labor Agreement, dated March 1, 2000. Both agreements recognize Local 103 as the exclusive collective bargaining representative of all employees performing a broad range of electrical work. Both agreements also provide that disputes shall be resolved via binding arbitration before a Joint Conference Committee ("Committee") consisting of three union representatives and three employer representatives.[2]

---

[2] The agreements use the same language:
Section 1.04  There shall be a Joint Conference Committee of three (3) representing the Union and three (3) representing the Employer.  It shall meet regularly at such stated times as it may decide.  However, it shall also meet within forty-eight (48) hours when notice is given by either party. It shall select its own Chairman and Secretary.

These agreements, like the Letter of Assent, were duly signed by appropriate representatives of the parties.

At the heart of this case is a purported "Jurisdictional Agreement," dated October 2, 1998. The document, which recognizes the existence of "jurisdictional issues" between the Locals "regarding telecommunications projects," was characterized as an agreement between Local 103, Local 2222, and JCI. There are signature lines on the agreement for representatives of Local 103, Local 2222, JCI, and the International. Representatives of Local 103 and Local 2222 never signed the agreement. There are only two signatures: those of Frank Carroll, the International Vice President in charge of the New England region, and a JCI executive. The International Constitution provides that only the International

---

Section 1.05 All grievances or questions in dispute shall be adjusted by the duly authorized representatives of each of the parties to this Agreement. In the event that these two are unable to adjust any matter within 48 hours, they shall refer the same to the Joint Conference Committee.

Section 1.06 All matters coming before the Joint Conference Committee shall be decided by majority vote. Four members of the Committee, two from each of the parties hereto, shall be a quorum for the transaction of business, but each party shall have the right to cast the full vote of its membership and it shall be counted as though all were present and voting.

Section 1.07 Should the Joint Conference Committee fail to agree or to adjust any matter, such shall then be referred to the Council on Industrial Relations for the Electrical Contracting Industry for adjudication. The Council's decision shall be final and binding on both parties hereto.

Section 1.08 When any matter in dispute has been referred to conciliation or arbitration for adjustment, the provisions and conditions prevailing prior to the time such matters arose shall not be changed or abrogated until agreement has been reached or a ruling has been made.

President, or her duly appointed representative, can enter into a binding agreement with a company.

After it signed the Letter of Assent and the Jurisdictional Agreement, JCI assigned work to both Locals. JCI continued assigning work to Local 2222 after its CBA with Local 2222 expired at the end of 1999. JCI says Local 2222 agreed to extend this CBA while the parties negotiated a new one.

A Boston Chapter contractor filed charges against JCI alleging that it had violated the Telecommunications Labor Agreement by giving work reserved for Local 103 members to members of Local 2222. On January 21, 2002, Local 103 referred a grievance to the Committee, under the procedure set forth in the Telecommunications Labor Agreement, asserting that JCI was assigning work covered by that agreement to members of Local 2222.[3]

The Committee met on February 4, 2002. Per the terms of the Telecommunications Labor Agreement, the Committee consisted of three representatives of Local 103 and three representatives of the Boston Chapter. As JCI alleged to the court, but not to the Committee, the Boston Chapter representatives worked for competitors of JCI that had in the past lost job bids to JCI.

---

[3] Apart from its claim relating to the hiring of members of Local 2222, Local 103 also claimed that at one project site JCI improperly subcontracted work covered by the Telecommunications Labor Agreement to Maverick Construction (which may or may not employ electricians from one of the two Locals). JCI stipulated at the hearing that it had violated the Telecommunications Labor Agreement in this regard.

Robert Feldman, Executive Vice President of JCI, claims that JCI did not learn that the Boston Chapter arbitrators were employed by competitors until after the start of the hearing. In any event, JCI, represented by different counsel than its appellate counsel, did not object during the arbitral hearing to the Committee's composition. There is also no evidence or claim that JCI inquired, either prior to or during the hearing, as to the employers of the Committee members.

Both parties presented evidence and arguments and responded to questions from the Committee. JCI's basic position was that it had obligations to both Locals, and that the Jurisdictional Agreement covered the dispute. Local 103 argued that the Jurisdictional Agreement had never been executed and was not binding. Local 103 submitted evidence including its correspondence with JCI, the Letter of Assent, a list of JCI employees, and payroll records and correspondence of select JCI employees. Local 103 argued that JCI had hired non-members as technicians, apprentices, and other types of workers to do electrical work covered by the Telecommunications Labor Agreement. In response, JCI submitted only the Jurisdictional Agreement and Letter of Assent. It contended that it had hired only members of Locals 103 and 2222, and that its hiring practices were consistent with the Jurisdictional Agreement. Local 103 addressed the

viability of the Jurisdictional Agreement in response to the arguments and evidence presented by JCI.

The Committee found: "[JCI] violated the Collective Bargaining Agreement by assigning bargaining unit work to non-bargaining unit members and by contracting out bargaining unit work." The Committee found that the Jurisdictional Agreement did not govern (1) because it was not signed by the affected Locals; (2) because the president of the International did not sign the Jurisdictional Agreement, as required under the International Constitution to give legal effect to this sort of agreement; and (3) because JCI presented no evidence that it had a current, executed CBA with Local 2222 that would justify assignment of work to Local 2222 under the Jurisdictional Agreement. Any one of these three reasons, the Committee held, would be sufficient to rebut JCI's argument that the Jurisdictional Agreement resolved the dispute. The Committee ordered JCI to pay damages to Local 103 "in an amount equal to make whole the Union and its members" for all past and continuing violations. The Committee also required JCI to make available payroll and other records to Local 103.

JCI petitioned to vacate the arbitration award pursuant to 29 U.S.C. § 185 (2000). Local 103 answered the petition and filed a cross-claim to affirm the award, then moved for summary judgment. Local 103 argued that JCI's claims -- that the Committee was biased, that the Committee exceeded its jurisdiction, and that

the signing of the Letter of Assent was procured by fraud -- were waived because JCI failed to raise them during the challenged proceeding. In support of this motion, Local 103 submitted an affidavit from its business manager, Richard Gambino, and exhibits including the Letter of Assent, Telecommunications Labor Agreement, Jurisdictional Agreement, Committee decision, and correspondence between Local 103, JCI, and the Committee secretary. JCI opposed the motion for summary judgment and moved under Fed. R. Civ. P. 56(f) for limited discovery before the court ruled on Local 103's motion.[4] In support of its opposition, JCI submitted affidavits from Feldman and Andrew Pickett, an attorney for JCI. It also submitted exhibits including two CBAs between JCI and Local 2222 (one expired, one concluded after the arbitration); an excerpt from the Constitution of the International; and correspondence between the Locals and JCI.

The district court granted Local 103's motion for summary judgment on August 29, 2002. JCI Communications, Inc. v. Int'l Bhd. of Elec. Workers Union, Local 103, 2002 WL 2005852, slip op. at 2 (D. Mass. Aug. 29, 2002). The court held that JCI "invited" the Committee to rule on the Jurisdictional Agreement by relying on the Agreement as its "primary defense." Id. at 2. The court rejected JCI's bias argument on the ground that employer

---

[4] As part of its Rule 56(f) request, JCI sought to depose Carroll, former Local 103 business manager Paul Ward, and other members of Locals 103 and 2222.

-10-

representatives on the Committee were "necessarily selected" from JCI's competitors. Id. at 3. In addition, the court held that JCI had waived its argument that it signed the Letter of Assent based on fraudulent representations by Local 103. Id. The court also dismissed evidence of a recent CBA between JCI and Local 2222 because the agreement postdated the arbitral decision. Id. at 2.

## II.

This court's review of entry of summary judgment is de novo. Second Generation Props., L.P. v. Town of Pelham, 313 F.3d 620, 629 (1st Cir. 2003). That standard applies to our review of a district court's ruling on an arbitral award. Wonderland Greyhound Park, Inc. v. Autotote Sys., Inc., 274 F.3d 34, 35 (1st Cir. 2001). There is no material dispute of fact as to what was submitted to the arbitrators.

In turn, both this court and the district court are bound by the very narrow and very deferential standard of review of arbitral decisions. See Keebler Co. v. Truck Drivers, Local 170, 247 F.3d 8, 10 (1st Cir. 2001). In general, a court may vacate an arbitral award only in rare circumstances, such as when there was misconduct by the arbitrator, when the arbitrator exceeded the scope of her authority, or when the award was made in manifest disregard of the law. Bull HN Info. Sys. Inc. v. Hutson, 229 F.3d 321, 330-31 (1st Cir. 2000). Many of those circumstances are

codified in the Federal Arbitration Act, 9 U.S.C. §§ 1-16, which provides, <u>inter alia</u>, that a court may vacate an award:

> (2) Where there was evident partiality or corruption in the arbitrators, or either of them;
> . . . .
> (4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

<u>Id.</u> § 10(a). JCI's claims that the arbitrators acted without jurisdiction and were biased are brought under these sections.

A. <u>Whether the arbitrators exceeded their authority</u>

JCI argues that the arbitrators were limited to interpreting the Telecommunications Labor Agreement, under which Local 103 brought its grievance. From this, JCI reasons that the arbitrators exceeded their authority by: (1) deciding an issue governed by another agreement (the Jurisdictional Agreement), (2) invalidating the Jurisdictional Agreement, (3) deciding an issue involving a non-party to the arbitration (Local 2222), and (4) reviewing JCI's CBA with and recognition of Local 2222.

For almost forty years it has been clear that arbitrators can resolve jurisdictional disputes involving an employer and two local unions, whether the dispute is "(1) a controversy as to whether certain work should be performed by workers in one bargaining unit or those in another; or (2) a controversy as to which union should represent the employees doing particular work." <u>Carey</u> v. <u>Westinghouse Elec. Corp.</u>, 375 U.S. 261, 263 (1964). <u>Carey</u>

held that the employer must arbitrate a work assignment jurisdictional dispute on the demand of only one union. Id. at 265-66. Sometimes the second union seeks to intervene in the arbitration, sometimes not, and this case involves no issue of arbitral authority to compel the second union's participation. See Elkouri & Elkouri: How Arbitration Works 350-51 (M.M. Volz & E.P. Goggin eds., 5th ed. 1997). Thus, there was nothing wrong in principle with the arbitrators reviewing the agreement with one local although a different local had some interests at stake. Of necessity, Carey means arbitrators may have to review the intersections of different labor agreements in the course of applying one of them.

JCI's argument that a problem arises because Local 2222, a non-party, is bound by the agreement is simply wrong. The arbitral order does not purport to be binding on Local 2222 and no relief is ordered as to that Local. It is true that, until and unless JCI withdraws from the Telecommunications Labor Agreement, JCI will have to pay Local 103 for the privilege of using Local 2222 members to do work the Committee found to be within the scope of the Telecommunications Labor Agreement. That may deter JCI from using Local 2222 workers, and Local 2222 may feel its contract is violated and grieve as a result. But that is a problem of the company's own making.

The argument that the arbitrators exceeded their authority by considering the Jurisdictional Agreement is also unavailing. JCI did not assert at the arbitration hearing that the Jurisdictional Agreement deprived the arbitrators of jurisdiction; nor did it reserve the issue of the meaning of the Jurisdictional Agreement during the arbitration hearing; nor did it refuse arbitration for any reason, much less on the ground that the arbitrators had no authority over the Jurisdictional Agreement. Once the submission to the arbitrators was made without such a reservation, it was for the arbitrators to determine the scope of their own authority. See Dorado Beach Hotel Corp. v. Unión de Trabajadores de la Industria Gastronómica de P.R. Local 610, 959 F.2d 2, 4-5 (1st Cir. 1992) ("[W]e normally will defer to an arbitrator's interpretation of the arbitral authority conferred by the CBA and the parties' submissions.").

Also, it was JCI which asked the arbitrators to consider the Jurisdictional Agreement when JCI relied on that Agreement in its defense to the grievance. JCI argued that the construction of the Telecommunications Labor Agreement must be undertaken in light of the Jurisdictional Agreement, and having raised the issue itself, JCI cannot complain that the arbitrators reached it. See, e.g., Rock-Tenn Co. v. United Paperworkers Int'l Union, 184 F.3d 330, 334 (4th Cir. 1999) ("[U]nconditional submission of an issue to arbitration, without any objection to the arbitrator's authority

-14-

to decide that issue, cedes authority to the arbitrator, or represents consent to arbitration of that issue.") (internal quotations omitted); Franklin Elec. Co. v. Int'l Union, United Auto. Aerospace & Agric. Workers, 886 F.2d 188, 191-92 (8th Cir. 1989) (a party cannot argue, after an arbitral award, that the arbitrator lacked authority to decide a jurisdictional or arbitrability issue the party itself submitted); Jones Dairy Farm v. Local No. P-1236, United Food & Commercial Workers Union Int'l, 760 F.2d 173, 175-76 (7th Cir. 1985) ("if a party voluntarily and unreservedly submits" a jurisdictional issue to arbitration, then the party "cannot later argue that the arbitrator had no authority to resolve it"); see also Nghiem v. NEC Elec., Inc., 25 F.3d 1437, 1440 (9th Cir. 1994) ("[W]e have long recognized a rule that a party may not submit a claim to arbitration and then challenge the authority of the arbitrator to act after receiving an unfavorable result.") (quotation omitted); Dorado Beach, 959 F.2d at 4 ("[A]n arbitrator's authority under the CBA may be supplemented by the parties' submissions."). See generally Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.").

Nor is there any merit to the assertion that the manner in which the arbitrators construed the effect of the Jurisdictional Agreement exceeded their authority. An arbitrator's award must be

-15-

affirmed so long as the arbitrator is "even arguably construing or applying the contract." United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 38 (1987). Based upon the evidence before the arbitrators, the Jurisdictional Agreement needed specific signatures to be executed and those signatures were not on the document: neither of the two Locals executed it and there was no evidence that the International President approved the agreement, as the terms of the International's Constitution required.[5] There was no error in the arbitrator's finding that JCI did not proceed on the basis of an executed and binding Jurisdictional Agreement.[6]

Since a court reviews the merits of the arbitral decision based on the record before the arbitrator under a narrow standard of review, JCI is not free now, under the guise of judicial review of an arbitral award, to conduct discovery and obtain a de novo determination of the meaning and validity of the Jurisdictional

---

[5] JCI argues that when the Vice President of the International signed the Jurisdictional Agreement he represented that he had the authority to bind both Local 103 and Local 2222. JCI also argues that a precondition to its entering into the Telecommunications Labor Agreement with Local 103 was the execution of the Jurisdictional Agreement.

[6] JCI's claim that the Committee overstepped its authority by reviewing its CBA with Local 2222 also fails. The Committee did not interpret such a CBA. It merely observed that the Jurisdictional Agreement (which JCI submitted) required a current CBA between JCI and Local 2222 to be effective, and noted that JCI had presented no evidence of such an agreement. Furthermore, the Committee's finding that JCI lacked a current CBA with Local 2222 was one of three alternative bases, each independently sufficient, for the Committee's holding that the Jurisdictional Agreement did not protect JCI against liability.

-16-

Agreement.[7]  It long ago waived any such claim through its actions. The district court was quite correct not to permit this effort by JCI to evade the normal rules of review.[8]

B.  <u>Whether the arbitrators demonstrated evident partiality</u>

Under the FAA, an arbitral award may be vacated on grounds of "evident partiality" of the arbitrators.  9 U.S.C. § 10(a)(2).  Evident partiality is more than just the appearance of possible bias.  Rather, evident partiality means a situation in which "a reasonable person would have to conclude that an arbitrator was partial to one party to an arbitration." <u>Nationwide Mut. Ins. Co.</u> v. <u>Home Ins. Co.</u>, 278 F.3d 621, 626 (6th Cir. 2002) (internal quotations omitted); <u>accord</u> <u>ANR Coal Co.</u> v. <u>Cogentrix of N.C., Inc.</u>, 173 F.3d 493, 500-501 (4th Cir. 1999); <u>Morelite Constr. Corp.</u> v. <u>N.Y. City Dist. Council Carpenters Benefit Funds</u>, 748 F.2d 79, 84 (2d Cir. 1984); <u>see also</u> <u>Al Harbi</u> v. <u>Citibank, N.A.</u>, 85 F.3d 680, 683 (D.C. Cir. 1996) ("[T]he claimant must establish specific facts that indicate improper motives on the part of an

---

[7] JCI argues that the district court decided two issues of material fact on summary judgment: (1) that JCI did not allege to the Committee that Local 103 made misrepresentations around the time of the signing of the Letter of Assent; and (2) that the CBA between JCI and Local 2222 was executed after the Committee's decision.  The record of the Committee hearing shows that JCI did not allege fraud by Local 103 to the Committee and that JCI presented no evidence of a current, executed CBA to the Committee.

[8] JCI also waived its mitigation of damages argument, which it raised for the first time in its reply brief.  <u>N. Am. Specialty Ins. Co.</u> v. <u>Lapalme</u>, 258 F.3d 35, 45 (1st Cir. 2001).

arbitrator."). See generally Montez v. Prudential Secs., Inc., 260 F.3d 980, 983 (8th Cir. 2001) (collecting cases on "evident partiality" standard). The burden is on JCI to establish evident partiality. See Andersons, Inc. v. Horton Farms, Inc., 166 F.3d 308, 328-29 (6th Cir. 1998); Al Harbi, 85 F.3d at 683; Consolidated Coal Co. v. Local 1643, United Mine Workers, 48 F.3d 125, 129 (4th Cir. 1995); Health Servs. Mgmt. Corp. v. Hughes, 975 F.2d 1253, 1258 n.3 (7th Cir. 1992); Sheet Metal Workers Int'l Ass'n, Local 162 v. Jason Mfg., Inc., 900 F.2d 1392, 1398 (9th Cir. 1990); Middlesex Mut. Ins. Co. v. Levine, 675 F.2d 1197, 1201 (11th Cir. 1982) (per curiam). The purported bias here is that the three arbitrators from the management side came from JCI's business competitors.

Absent exceptional circumstances, a court "will not entertain a claim of personal bias where it could have been raised at the arbitration proceedings but was not." Fort Hill Builders, Inc. v. Nat'l Grange Mut. Ins. Co., 866 F.2d 11, 13 (1st Cir. 1989) (per curiam); see Early v. E. Transfer, 699 F.2d 552, 558 (1st Cir. 1983). It is undisputed that the issue of bias was not raised before the arbitrators. JCI attempts to excuse this by saying it did not know the company affiliations of these industry arbitrators until after the hearing.

JCI did know that the three employer representatives on the Committee would come from Boston Chapter companies, that is,

from its industry and related industries, and so potentially from its competitors. The Telecommunications Labor Agreement quite reasonably called specifically for arbitrators from relevant industries, whose expertise would be a considerable benefit. See Merit Ins. Co. v. Leatherby Ins. Co., 714 F.2d 673, 679 (7th Cir. 1983); In re Andros Compania Maritima, SA, 579 F.2d 691, 701 (2d Cir. 1978). That the arbitrators came from the same industry does not in itself approach evident partiality. See Delta Mine Holding Co. v. AFC Coal Props., Inc., 280 F.3d 815, 821 (8th Cir. 2001) (partisan arbitrators are generally permissible if that is what the parties' arbitration clause contemplated); accord ATSA of Cal., Inc. v. Cont'l Ins. Co., 754 F.2d 1394, 1395 (9th Cir. 1985) (order); Nationwide Mut. Ins. Co. v First State Ins. Co., 213 F. Supp. 2d 10, 17 (D. Mass. 2002). This claim is a far cry from Commonwealth Coatings Corp. v. Continental Casualty Co., 393 U.S. 145 (1968), where at the time of the arbitration hearing the party that subsequently challenged the award lacked even an "intimation" of the source of the alleged bias. Id. at 147-48; see Sheet Metal Workers Int'l Ass'n Local 420 v. Kinney Air Conditioning Co., 756 F.2d 742, 746 (9th Cir. 1985) (Kennedy, J.) ("cases in which courts have faulted arbitrators for their failure to disclose potential sources of bias are inapposite" where the CBA contemplated that management representatives on an arbitral panel might be a party's competitors) (citation omitted). The mere fact that the panel

included business rivals of one party does not rise to the level of evident partiality.  <u>Id.</u>

In practice, that risk of bias could nonetheless materialize in specific instances.  But JCI, which was put on notice of the risk when it signed the contract, chose not to inquire about the backgrounds of the Committee members either before or during the hearing.  JCI needed to act before the Committee rendered its decision.  It would undermine the arbitral process to permit an employer with an industry-represented panel to await the outcome of an arbitration before deciding to cry bias.  <u>See</u> <u>Early</u>, 699 F.2d at 558 ("[W]e cannot accept that parties have a right to keep two strings to their bow -- to seek victory before the tribunal and then, having lost, seek to overturn it for bias never before claimed.").  JCI has waived the claim.[9]

We **affirm** entry of summary judgment for Local 103 enforcing the arbitral award.  Costs are awarded to Local 103.

---

[9] Having failed to raise the issue of bias with the arbitrators, JCI was not entitled to any discovery on this point from the court.  <u>See</u> <u>Woods</u> v. <u>Saturn Distrib. Corp.</u>, 78 F.3d 424, 430-31 (9th Cir. 1996).