COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:   Judges Huff, Causey and White
Argued at Richmond, Virginia

DEVIN J. GAROFALO

v.      Record No. 1303-23-2

JAYNE W. DI VINCENZO

OPINION BY
JUDGE DORIS HENDERSON CAUSEY
DECEMBER 30, 2024

FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Jacqueline S. McClenney, Judge

Monica T. Monday (David R. Berry; Gentry Locke, on briefs), for
appellant.

Henry I. Willett III (Belinda D. Jones; Christian & Barton, LLP, on
brief), for appellee.

This appeal concerns a cross-petition to vacate the award of a panel of arbitrators. The

circuit court granted Jayne Di Vincenzo's petition to confirm an arbitral award and denied Devin

Garofalo's cross-petition to vacate. Garofalo argues that the circuit court erred by declining to

set aside the award on the grounds of an arbitrator's "evident partiality" under Code

§ 8.01-581.010(2). Garofalo also argues that Di Vincenzo should not have been awarded

attorney fees.

On appeal, Garofalo does not argue that the arbitrator, Michael Glasser, was actually

biased toward either party. But he argues that the arbitrator's failure to disclose prior

connections with Di Vincenzo requires that the award be vacated on the grounds of "evident

partiality." We disagree, holding that the undisclosed information did not rise to the level of

"evident partiality." Additionally, finding no error, we affirm the circuit court's attorney fees

award.

## I. BACKGROUND

In March 2022, a panel of Financial Industry Regulatory Authority (FINRA) arbitrators ruled for Di Vincenzo in a dispute with Garofalo over an asset purchase agreement. The agreement had set the parameters for the sale of Di Vincenzo's financial securities company, Lions Bridge Financial Advisors, Inc., to Garofalo and his financial securities company, Colonial River Wealth Management, LLC. The arbitration panel found Garofalo in default of obligations under the agreement and awarded Di Vincenzo $1,548,638 in compensatory damages and unremitted payments, $490,639 in attorney fees, and additional fees and costs.

In March 2022, Di Vincenzo moved to confirm the award in circuit court. In April 2022, Garofalo cross-petitioned to vacate on the grounds of an arbitrator's "evident partiality" under Code § 8.01-581.010(2). Garofalo alleged that an arbitrator on the panel had failed to disclose a prior relationship with Di Vincenzo.[1] Di Vincenzo filed a responsive pleading denying the allegations and requesting reimbursement for attorney fees incurred opposing the cross-petition. Discovery followed, and the circuit court conducted two days of hearings in May 2023. In June 2023, the circuit court rejected Garofalo's evident partiality argument and confirmed the arbitral award. After receiving post-hearing briefing on the bifurcated attorney fees issue, the circuit court awarded Di Vincenzo $333,613.50 in attorney fees.[2]

Prior to the arbitration, the arbitrator disclosed to the parties that he was on the Board of Directors of Old Point Financial Corporation (Old Point) and one of Old Point's wholly owned

---

[1] Garofalo also argued to the circuit court that the arbitrator's nondisclosure constituted "misconduct prejudicing the rights of any party" under Code § 8.01-581.010(2) and that the arbitrators exceeded their authority in ordering attorney fees that Garofalo alleged had already been awarded to Di Vincenzo. Garofalo did not assign error to the circuit court's adverse rulings on either of these arguments. Accordingly, we do not address these issues in this opinion.

[2] This attorney fees award was solely for litigation involving the confirmation of the arbitration award. It did not include the $490,639 previously awarded by the panel of arbitrators.

subsidiaries, Old Point National Bank, and that he was a shareholder of Old Point National Bank. The arbitrator also disclosed his connections, largely as a shareholder or accountholder, to fourteen other companies, including financial institutions. The arbitrator disclaimed any prior relationships or interactions with either party to the arbitration. As Garofalo emphasized to the circuit court and on appeal, Di Vincenzo and Lion's Bridge had, in fact, once contracted with Old Point Trust, Old Point's other wholly owned subsidiary.

For fifteen months in 2014 and 2015, Di Vincenzo and Lion's Bridge had provided financial advisory services to Old Point Trust's customers. Some of Old Point Trust's customers were also customers of Old Point National Bank, and the revenues of both subsidiary organizations ultimately went to Old Point. Di Vincenzo and Lion's Bridge expected to benefit from the arrangement by receiving referrals for new customers, including from Old Point National Bank. The relationship ended after fifteen months when neither party received the benefit they had expected. Just before the relationship terminated, Lion's Bridge and Di Vincenzo had made almost $13,000 and Old Point had made $8,000. The arbitrator testified that he did not disclose these connections because he did not recall Di Vincenzo or Lion's Bridge. Before taking the case, the arbitrator conducted a conflict check through his law firm's database and discovered no connections to either party. Additionally, as the arbitrator noted, he was not and had never been on the Board of Directors of Old Point Trust, the independent legal entity that held a contractual relationship with Di Vincenzo and Lion's Bridge.

The record included various additional details about the relationship between Lion's Bridge, Di Vincenzo, and Old Point Trust. Lion's Bridge financial advisors had been permitted to use offices, as available, in Old Point Trust's facilities, including a building in which the arbitrator had an ownership interest, though they had no permanent offices in the facilities.

Lion's Bridge advisors would display placards advertising their company while meeting with customers but would take them down when they left.

Additionally, the record showed that the arbitrator and Di Vincenzo attended the same event on at least two occasions, at meetings of Old Point's "Southside Regional Board," a non-fiduciary Board that the arbitrator chaired, which held community engagement meetings aimed at attracting referrals to Old Point National Bank. The arbitrator did not separately disclose his chairmanship of this Board, which he performed in his capacity as a member of Old Point National Bank's Board of Directors. A meeting agenda and minutes showed that at one of those two meetings, the arbitrator introduced Di Vincenzo as a speaker for a presentation scheduled to last fifteen minutes. Finally, the record established that as a member of Old Point's Board of Directors, the arbitrator would have received Old Point Trust documents that contained references to Di Vincenzo and Lion's Bridge. The references were made in Old Point Trust's monthly meeting minutes and executive reports and presented to Old Point's Directors, in binders containing hundreds of pages of other documents, one or two days before board meetings, before being returned by Directors at the meetings. The arbitrator testified that he did not recall ever having met or introduced Di Vincenzo. Nor did he recall having read about Di Vincenzo or Lion's Bridge.

Before the circuit court, the arbitrator unequivocally stated, "I stand by my oath." He emphasized that he simply did not recall any interactions with either party prior to the arbitration and noted that, if he had been aware of Old Point Trust's connections with Di Vincenzo and Lion's Bridge, "I certainly would have disclosed it, and I likely would not have been involved in this case." When asked whether this was "because you recognize that it creates an appearance that would call into question whether you would be impartial," the arbitrator said, "I think that's fair."

On June 8, 2023, the circuit court confirmed the award. In a written order, the circuit court found that the arbitrator "is not and was not directly involved with Old Point Trust," that there had been at least four years between the ending of the relationship between Old Point Trust and Lion's Bridge, and that the arbitrator "does not recall ever meeting [Di Vincenzo] prior to the arbitration." *Di Vincenzo v. Garofalo*, No. CL22-975, at 2-3 (Va. Cir. Ct. June 8, 2023) (order) (*Di Vincenzo*). The court then proceeded to the legal question presented, whether the undisclosed connections showed "evident partiality" requiring vacatur of the award under Code § 8.01-581.010(2), the Virginia Uniform Arbitration Act (VUAA). The VUAA provides that "upon application of a party, the court shall vacate an [arbitrator's] award where . . . there was *evident partiality* by an arbitrator appointed as a neutral, corruption in any of the arbitrators, or misconduct prejudicing the rights of any party." Code § 8.01-581.010(2) (emphasis added).

The circuit court noted that Virginia courts had not established a test for "evident partiality." Observing that the Federal Arbitration Act (FAA) also permits vacatur of arbitral awards for "evident partiality" and that the Supreme Court of Virginia has cited FAA cases to help construe the VUAA, the circuit court proceeded to apply the Fourth Circuit's "evident partiality" test. *Di Vincenzo*, at 4 (citing *McMullin v. Union Land & Mgmt. Co.*, 242 Va. 337 (1991)). The circuit court quoted the Fourth Circuit's standard that "the 'party seeking vacatur must put forward facts that *objectively* demonstrate such a degree of partiality that a reasonable person could assume that the arbitrator had improper motives.'" *Id.* (quoting *ANR Coal Co. v. Cogentrix of North Carolina, Inc.*, 173 F.3d 493, 501 (4th Cir. 1999)). And it quoted the Fourth Circuit's four-factor test:

> (1) the extent and character of the personal interest, pecuniary or otherwise of the arbitrator in the proceeding; (2) the directness of the relationship between the arbitrator and the party he is alleged to favor; (3) the connection of that relationship to the arbitration; and

(4) the proximity in time between the relationship and the arbitration proceeding.

*Id.* (quoting *ANR Coal*, 173 F.3d at 500).

The circuit court noted that in reviewing each factor, the court should assess "whether the asserted bias is 'direct, definite and capable of demonstration rather than remote, uncertain or speculative' and whether the facts are sufficient to indicate 'improper motives on the part of the arbitrator.'" *Id.* (quoting *ANR Coal*, 173 F.3d at 500).

Applying the Fourth Circuit's test, the circuit court found (1) that "Respondent has not demonstrated that Arbitrator Glasser had any interest in the proceeding, whether personal, pecuniary, or otherwise." *Id.* It rejected Garofalo's argument that the arbitrator once stood to profit, as a shareholder of Old Point National Bank, from Di Vincenzo's work with Old Point Trust, characterized the connection between the arbitrator, in his former role as an Old Point director, and Old Point Trust as "tenuous," and noted that the arbitrator had disclosed this role to the parties. *Id.* at 5. The court added, "it is unclear how Arbitrator Glasser could possibly benefit from the arbitration proceeding." *Id.* at 5. The court then found (2) that the record showed only "one minor direct relationship between Arbitrator Glasser and the Petitioner, that of an introducer to the person who is being introduced." *Id.* at 6. The court found (3) "a tenuous connection" between that relationship and the arbitration. *Id.* And the court found (4) that over five years had passed between the end of the relationship between the arbitrator and Di Vincenzo and the arbitration. *Id.* at 7.[3] The court found that the assertions of the arbitrator's bias were thus "remote, uncertain or speculative," that the "facts in the present case are insufficient to

---

[3] In assessing the fourth factor, the circuit court concluded that five years had passed by comparing the date of the arbitration's commencement with April 21, 2015, the date when the arbitrator introduced Di Vincenzo at an event. The over four-year difference stated elsewhere is based on the date when the Lion's Bridge relationship ended, in December 2015.

indicate 'improper motives on the part of the arbitrator,'" and that "Respondent has failed to put forward facts that objectively demonstrate such a degree of partiality that a reasonable person could assume that the arbitrator had improper motives." *Id.* at 5, 13. Therefore, the court denied Garofalo's cross-petition to vacate. *Id.*[4] And, after post-hearing briefing, the circuit court granted Di Vincenzo $333,613.50 in attorney fees spent litigating the confirmation of the award.

Garofalo timely noted his appeal of the circuit court's award, arguing that (1) the circuit court erred in ruling that there was no "evident partiality by an arbitrator appointed as a neutral" under Code § 8.01-581.010(2) and that (2) the circuit court erred "in awarding Di Vincenzo attorney fees for the confirmation proceeding, and in finding that Di Vincenzo complied with Rule 3:25."

## II. ANALYSIS

### A. The Evident Partiality Standard Under the Virginia Uniform Arbitration Act

To begin, we must address the meaning of "evident partiality" under Code § 8.01-581.010(2). On appeal, Garofalo argues that the circuit judge misconstrued the "evident partiality" standard and that "evident partiality" under the VUAA requires only a showing that an arbitrator failed to disclose facts that "might create an impression of possible bias." Di Vincenzo, by contrast, argues that "evident partiality" under the VUAA requires vacatur only when "a reasonable person would have to conclude that an arbitrator was partial," as the Fourth Circuit has required in interpreting the FAA. Both parties agree that "evident partiality" has not yet been construed by our state's appellate courts. The meaning of the term "evident partiality" under the VUAA is a legal question that we review de novo. *See Quyen Vinh Phan Le v. Commonwealth*, 65 Va. App. 66, 76 (2015). For the following reasons, we agree with the circuit

---

[4] The trial court also rejected Garofalo's arguments regarding "Misconduct Prejudicing the Rights of Any Party" and the arbitration panel's award of attorney fees. *See supra* note 1.

court and Di Vincenzo. We adopt the Fourth Circuit's *ANR Coal* interpretation of "evident partiality."

1. "Evident Partiality" in the VUAA and FAA

The VUAA provides that "upon application of a party, the court shall vacate an [arbitrator's] award where . . . [t]here was *evident partiality* by an arbitrator appointed as a neutral, corruption in any of the arbitrators, or misconduct prejudicing the rights of any party." Code § 8.01-581.010(2) (emphasis added). This provision mirrors, almost word for word, the arbitrator disqualification provision of the FAA, which reads, in relevant part:

> (a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—
>
> . . . .
>
> (2) where there was *evident partiality* or corruption in the arbitrators, or either of them[.]

9 U.S.C. § 10(a)(2) (emphasis added).

Neither this Court nor the Virginia Supreme Court has interpreted the language of either provision. Therefore, this case presents an issue of first impression for us.[5]

2. The Fourth Circuit's Interpretation of Evident Partiality

The Fourth Circuit has an established definition of, and test for, "evident partiality." In the Fourth Circuit, "evident partiality" under the FAA is established only when the party seeking vacatur demonstrates "that a reasonable person would have to conclude that an arbitrator was partial to the other party to the arbitration," or, in other words, has "put forward facts that

---

[5] In a decision not binding on this Court, the Circuit Court for the City of Richmond applied the Fourth Circuit's standard for "evident partiality" under the FAA in the VUAA context. *See Williams Trading LLC v. Manaster*, 111 Va. Cir. 240, 254 (Richmond City 2023).

objectively demonstrate such a degree of partiality that a reasonable person could assume that the arbitrator had improper motives." *ANR Coal*, 173 F.3d at 500-01 (quoting *Consolidation Coal Co. v. Local 1643, United Mine Workers of Am.*, 48 F.3d 125, 129 (4th Cir. 1995)). It has also stated that courts should examine four factors in determining evident partiality:

> (1) the extent and character of the personal interest, pecuniary or otherwise, of the arbitrator in the proceeding; (2) the directness of the relationship between the arbitrator and the party he is alleged to favor; (3) the connection of that relationship to the arbitration; and (4) the proximity in time between the relationship and the arbitration proceeding.

*Id.* at 500 (*quoting Consolidation Coal*, 48 F.3d at 130).

The Fourth Circuit's interpretation followed from its acceptance of Justice White's concurrence as the holding of the United States Supreme Court's fractured decision in *Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145 (1968). In that case, six justices agreed to vacate an award due to an undisclosed relationship between an arbitrator and an arbitral party even though the petitioner did not allege that the arbitrator was actually biased. *Id.* at 147-48. But the majority split, four to two, on the meaning of the "evident partiality" standard they were applying. Justice Black's four-justice plurality opinion interpreted "evident partiality" to require disclosure of "*any* dealings that *might* create an *impression* of *possible* bias" and to prohibit arbitral bodies "that *might reasonably be thought biased* against one litigant and favorable to another." *Id.* at 149, 150 (emphases added). The plurality opinion borrowed from judicial ethics standards and argued that "we should, if anything, be even more scrupulous to safeguard the impartiality of arbitrators than judges." *Id.* at 149. Justice White, concurring with Justice Marshall, stated that he joined in Justice Black's "opinion" but rejected any equivalence with judicial standards. *Id.* at 149, 150. And the concurrence agreed to vacate only because the undisclosed relationships concerned an arbitrator's "substantial interest in a

firm which has done more than trivial business with a party." *Id*. at 151-52. For Justice White, the breadth of business relationships likely to be held by a qualified arbitrator in his industry required limitations on the disclosure requirement. *Id*. at 151 ("He [an arbitrator] cannot be expected to provide the parties with his complete and unexpurgated business biography."). Many courts have found this divergence to be material. *See, e.g.*, *Morelite Constr. Corp. v. N.Y. City Dist. Council Carpenters Benefit Funds*, 748 F.2d 79, 83 n.3 (2d Cir. 1984) ("[T]he two opinions are impossible to reconcile . . . .").

In a line of cases, the Fourth Circuit has interpreted the FAA's "evident partiality" standard in accordance with Justice White's concurrence, and has thus distinguished "evident partiality" from the mere possibility of an "appearance of bias" and limited the undisclosed relationships requiring vacatur to those that would lead a reasonable person to conclude that the arbitrator was partial. *See Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co.*, 991 F.2d 141, 146 (1993); *Consolidation Coal*, 48 F.3d at 129; *ANR Coal*, 173 F.3d at 500-01. Most circuits that have considered the issue have reached the same conclusion. *See Petition for Writ of Certiorari*, *Monster Energy Co. v. City Bevs., LLC*, 141 S. Ct. 164 (2020) (No. 19-1333), 2020 U.S. S. Ct. Briefs LEXIS 5853, at *27, *31 ("The First, Second, Third, Fourth, Fifth, and Sixth Circuits require those seeking vacatur of an arbitration award for evident partiality to show that 'a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration.' . . . By contrast, the Ninth and Eleventh Circuits have adopted a much less demanding, 'reasonable impression of partiality' standard."); *JCI Commc'ns, Inc. v. Int'l Bhd. of Elec. Workers, Local 103*, 324 F.3d 42, 51 (1st Cir. 2003); *Morelite*, 748 F.2d at 84; *Freeman v. Pittsburgh Glass Works, LLC*, 709 F.3d 240, 251-53 (3d Cir. 2013); *Positive Software Sols., Inc. v. New Century Mortg. Corp.*, 476 F.3d 278, 283 (5th Cir. 2007); *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 429 F.3d 640, 644 n.5 (6th Cir. 2005).

3. Analysis of the Fourth Circuit's Evident Partiality Standard

We are tasked with interpreting Virginia's Uniform Arbitration Act, not the Federal Arbitration Act. However, because the VUAA contains language almost identical to the FAA, reviewing the Fourth Circuit's reasoning in reaching its interpretation of "evident partiality" will aid our own interpretation. The Fourth Circuit has reached its understanding of "evident partiality" by working to define the United States Supreme Court's holding in *Commonwealth Coatings*.

First, the Fourth Circuit's approach recognizes that Justice White's concurrence should be understood as the Supreme Court's holding. When a Supreme Court decision is "fragmented" and "no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" *Secret v. Commonwealth*, 296 Va. 204, 222 (2018) (internal quotation marks omitted) (quoting *Marks v. United States*, 430 U.S. 188, 193 (1977)). The concurrence provided a narrower ground of decision and is therefore considered the holding of the Court. *See ANR Coal*, 173 F.3d at 499 n.3 ("Because the vote of either Justice White or Justice Marshall was necessary to create a majority, courts have given this concurrence particular weight.").

Second, the Fourth Circuit's interpretation of "evident partiality" as requiring more than a potential "impression of possible bias" follows from the reasoning of the *Commonwealth Coatings* concurrence. The concurrence explicitly rejected the analogy to judicial standards undergirding the plurality's strict interpretation. *Commonwealth Coatings*, 393 U.S. at 150 (White, J., concurring) ("The Court does not decide today that arbitrators are to be held to the standards of judicial decorum of Article III judges, or indeed of any judges."). It set forth substantiality and triviality requirements limiting the undisclosed relationships that require

- 11 -

vacatur. *Id.* at 151-52. And, read holistically, the concurrence requires a pragmatic approach incompatible with a requirement to vacate for a potential impression of possible bias. Justice White was unwilling to accept that the failure to disclose "[in]substantial" interests in a firm or "trivial" business dealings justified vacatur because he recognized that the arbitration system needs arbitrators with deep connections in the relevant industries. *Id.* at 150 ("It is often because [arbitrators] are men of affairs, not apart from but of the marketplace, that they are effective in their adjudicatory function."). Justice White explained that while he hoped that requiring pre-arbitration disclosures would prevent "a suspicious or disgruntled party [from later] seiz[ing] on [them] as a pretext for invalidating the award," he recognized that "an arbitrator's business relationships may be diverse indeed, involving more or less remote commercial connections with great numbers of people," and therefore emphasized that an arbitrator "cannot be expected to provide the parties with his complete and unexpurgated business biography." *Id.* at 151. Requiring vacatur for undisclosed facts that could create an impression of possible bias is incompatible with this caveat and with the animating concerns of Justice White's concurrence.

The Fourth Circuit's test, whether "a reasonable person would have to conclude that an arbitrator was partial to the other party to the arbitration," *ANR Coal*, 173 F.3d at 500, follows from the *Commonwealth Coatings* concurrence. It requires *more* than the mere possibility of an impression of possible bias but does not rise to the level of requiring proof of actual bias. And, consistent with the substantiality and triviality requirements, it focuses on the significance of the undisclosed relationship. Thus, we are persuaded that the Fourth Circuit's rule provides a strong interpretation of the Supreme Court's holding in *Commonwealth Coatings*.

In assessing the Virginia legislature's intention when it incorporated the term "evident partiality" from the federal law in 1986, we find the meaning that the *Commonwealth Coatings* concurrence gave the term in 1968 to provide useful background. A second clue for us is the

plain language of the term that the legislature adopted. "In interpreting [a] statute, courts apply the plain meaning . . . unless the terms are ambiguous or applying the plain language would lead to an absurd result." *Taylor v. Commonwealth*, 298 Va. 336, 341 (2020) (alterations in original) (internal citations omitted) (quoting *Baker v. Commonwealth*, 284 Va. 572, 576 (2012)). The plain language of the question whether "there was evident partiality by an arbitrator" would concern the conclusions that one would draw regarding bias, not just possible impressions. In light of the plain language of the VUAA and the *Commonwealth Coatings* concurrence, we are persuaded that the Fourth Circuit's test of evident partiality is the best interpretation of that term.

Garofalo advances two main counterarguments.[6] First, he argues that we should interpret *Commonwealth Coatings* pursuant to a number of federal circuit court and state court decisions issued between *Commonwealth Coatings* and Virginia's adoption of the VUAA in 1986 that quoted what Garofalo calls the plurality's "possible impression" standard. Garofalo argues that these cases show that prior to the VUAA's passage, "evident partiality" was shown whenever an arbitrator failed to disclose a fact that "might reasonably create the impression or appearance of bias." And, for Garofalo, this legal background should be understood as the meaning that Virginia's legislature adopted when it passed the VUAA.

We are not persuaded that these cases should guide our statutory interpretation. As Garofalo acknowledges, there was not unanimity in the courts' pre-1986 interpretation of "evident partiality." *See Merit Ins. Co. v. Leatherby Ins. Co.*, 714 F.2d 673, 682 (7th Cir. 1983) ("Justice White, concurring, purported to join Justice Black's opinion but actually took a quite

---

[6] Both parties also cite Virginia's decision not to adopt the Revised Uniform Arbitration Act (RUAA) in 2003. The RUAA contained many sections pertaining to different aspects of arbitration beyond evident partiality. *See* S.B. 307, 2003 Sess. (Va. 2003). The legislature provided no explanation for its decision not to adopt the RUAA. For this reason, we find it difficult to infer any specific legislative intent from the legislature's non-adoption of the RUAA.

different tack . . . [and,] since his vote was essential to a majority, what he said the Court did not decide the Court did not decide, whatever Justice Black may have hoped . . . ."); *Morelite*, 748 F.2d at 84 ("[W]e hold that 'evident partiality' within the meaning of 9 U.S.C. § 10 will be found where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration."). We do not have evidence to support the inference that the Virginia legislature relied on the other decisions that Garofalo cites when it adopted the VUAA. It is more reasonable to presume that our legislature was aware of the plain language of the term "evident partiality" and knew of the United States Supreme Court's *Commonwealth Coatings* concurrence and its exhortations of caution before setting aside arbitral awards.

Garofalo also argues that the plurality's standard should apply to nondisclosure cases and that the "reasonable person would have to conclude" standard, if applicable at all, should be confined to cases in which the arbitrator's nondisclosure is not at issue. Garofalo points to the concurrence's statement that "arbitrators are not automatically disqualified by a business relationship with the parties before them if both parties are informed of the relationship in advance, or if they are unaware of the facts but the relationship is trivial. I see no reason to automatically disqualify the best informed and most capable arbitrators." *Commonwealth Coatings*, 393 U.S. at 150. For Garofalo, this statement indicates that the only question that *Commonwealth Coatings* "left open" was whether awards should be vacated if arbitrators *do* make disclosures but the appearance of bias remains.

We are not persuaded. The *Commonwealth Coatings* concurrence did not only require a high bar for disqualifying arbitrators who have disclosed conflicts. It also limited the scope of the disclosure requirement—explicitly rejecting one that would disqualify for undisclosed insubstantial or trivial relationships. *See id.* at 151-52. Justice White emphasized that arbitrators, because they must be steeped in the field and thus will have manifold relationships

- 14 -

within it, "cannot be expected to provide the parties with [their] complete and unexpurgated business biography." *Id.* at 151. And generally, there is no reason to think that "evident partiality" means something different when the issue is nondisclosure; nondisclosure is one form of evidence of evident partiality. *See Freeman*, 709 F.3d at 254 ("The [FAA] does not distinguish between actual-bias and nondisclosure cases—instead, it condemns 'evident partiality' in all cases."). *Commonwealth Coatings* and the VUAA's plain language support a uniform meaning for "evident partiality."

Finally, we observe that the Fourth Circuit's four-part test provides a helpful guide to answering the evident partiality question. The assessment of whether a party has shown that "a reasonable person would have to conclude that an arbitrator was partial" is helped by an evaluation of the degree and quality of an arbitrator's personal interest in a case, by a consideration of the directness and temporal remoteness of an undisclosed arbitrator-party relationship, and by a consideration of the relevance of the relationship to the arbitration. *See ANR Coal*, 173 F.3d at 500-01. Additionally, reviewing each link in light of "whether the asserted bias is 'direct, definite, and capable of demonstration rather than remote, uncertain or speculative' and whether the facts are sufficient to indicate[7] 'improper motives on the part of the arbitrator'" helps assess what conclusions a reasonable person would draw. *See id.* at 500 (quoting *Consolidation Coal*, 48 F.3d at 129). Thus, in reviewing the circuit court ruling, we will apply the *ANR Coal* test for "evident partiality" and make use of its four factors.

B. "Evident Partiality" in this Case

On appeal, Garofalo argues that the arbitrator's nondisclosure of Old Point Trust's past connections to Di Vincenzo and Lion's Bridge, of his introduction of Di Vincenzo at a meeting,

---

[7] Consistent with the remainder of *ANR Coal*, the word "indicate" should be read to limit the test to the conclusions that a reasonable person would draw, not to test actual bias.

and of his attendance at two meetings at which Di Vincenzo was present require vacatur for "evident partiality." In assessing Garofalo's arguments, we review "the trial court's application of the law de novo" but are "bound by the trial court's factual findings unless those findings are plainly wrong or unsupported by the evidence." *Malbrough v. Commonwealth*, 275 Va. 163, 168-69 (2008).

Applying the Fourth Circuit's test for evident partiality stated in *ANR Coal*, we affirm the circuit court's confirmation of the arbitration award. The arbitrator's undisclosed connections with Di Vincenzo and Lion's Bridge were not significant enough that "a reasonable person would have to conclude that the arbitrator was partial." *See ANR Coal*, 173 F.3d at 500 (quoting *Consolidation Coal*, 48 F.3d at 129).

First, as the trial court found, the record in this case indicates that the "extent and character of the [arbitrator's] personal interest, pecuniary or otherwise, of the arbitrator in the proceeding" was negligible. *Id.* (quoting *Consolidation Coal*, 48 F.3d at 130). The relationship between Old Point Trust and Lion's Bridge had been over for at least four years by the time of the arbitration's commencement. The arbitrator never had supervisory authority over Old Point Trust, the legal entity with which Lion's Bridge had contracted in 2014 and 2015. The arbitrator may have once derived some indirect benefit from Old Point Trust's arrangement as a shareholder of Old Point National Bank, but that benefit would have been minor. That Old Point as a whole made only $8,000 from the relationship further supports this point. The record supports the trial court's finding that the arbitrator held no contemporaneous financial interest in Lion's Bridge and formerly held only a "tenuous" interest in Lion's Bridge's success. This interest does not indicate "improper motives on the part of the arbitrator." Any possibility of bias resulting from this prior relationship depends on conjecture and is thus "speculative." *See id.* (quoting *Consolidation Coal*, 48 F.3d at 129).

- 16 -

Second, the "[in]directness" of the connections between the arbitrator and Di Vincenzo also favor affirming the circuit court's decision. *Id.* (quoting *Consolidation Coal*, 48 F.3d at 130). The record supports the trial court's finding that the prior financial relationship between the arbitrator and Di Vincenzo, stated above, was "indirect" as well as "tenuous." And, as the circuit court found, the one direct relationship between them that we can garner from the record—that between an introducer and the one introduced, at Old Point's Southside Regional Board—was quite minor. The fact that the arbitrator did not separately disclose his participation on that nonfiduciary board, which occurred in the arbitrator's disclosed capacity as a Director of Old Point National Bank's Board of Directors, does not increase the significance of this connection. Third, turning to the relationship between the connections and the arbitration, while the undisclosed connections and the arbitration both concerned Lion's Bridge, nothing in the record indicates that the undisclosed connections related to the sale of Lion's Bridge or to either party's conduct following the sale. And fourth, as previously stated, the relationship concluded at least four years prior to the beginning of the arbitration.[8]

---

[8] Garofalo also argues that the arbitrator did not comply with the FINRA Rules and the "FINRA Dispute Resolution Services Arbitrator's Guide" and that this failure indicates evident partiality on the part of the arbitrator. In particular, Garofalo points to FINRA Rule 12405(a)(2), which requires arbitrators to "*make a reasonable effort* to learn of . . . any circumstances which might preclude the arbitrator from rendering an objective and impartial determination in the proceeding, including . . . any existing or past . . . relationships . . . with any party . . . that are likely to affect impartiality *or might reasonably create an appearance of partiality* or bias." (Emphases added). He also points to FINRA Arbitrator's Guide's statement that "the duty to disclose is ongoing." Garofalo argues that the arbitrator should have contacted Old Point to ask about possible conflicts once he learned that the proceeding involved a financial business, and Lion's Bridge in particular. "If anything," Garofalo argues, "the Arbitrator's failure to investigate *contributes* to the impression or appearance of bias in this case."

We are not persuaded. Even assuming that the arbitrator was not permitted by FINRA to rely on his law firm's conflict check, his failure to investigate further would not lead a reasonable person to conclude that he was biased. The relationship was remote, and there is no reason to doubt the arbitrator's testimony that he did not recollect Di Vincenzo or Lion's Bridge. A reasonable person would likely conclude that the arbitrator, believing he had done his due diligence, proceeded to the arbitration without prejudice toward either party.

Overall, a reasonable person would not have to conclude from the arbitrator's nondisclosure of prior connections with Di Vincenzo that he was partial toward either party. The arbitrator's testimony was that he would likely not have participated in the arbitration if he had been aware of the connections because he thought that the connections could create an impression of possible bias. This testimony does not indicate that the arbitrator's *non*disclosure, where he *was not* aware of the connections, would lead a reasonable person to conclude that he was biased or had improper motives. An entirely reasonable conclusion from the record is that the arbitrator simply did not recall any connection to Di Vincenzo or Lion's Bridge and that he never received more than a minor and indirect benefit from any business relationship with them. Affirming this arbitration award in accordance with the Fourth Circuit's standard reflects the fact that, as Justice White wrote in *Commonwealth Coatings*, the relationships possessed by a qualified arbitrator in his or her field "may be diverse indeed, involving more or less remote connections with great numbers of people," and that therefore, the arbitrator "cannot be expected to provide the parties with his complete and unexpurgated business biography." *Commonwealth Coatings*, 393 U.S. at 151. We affirm the circuit court's holding that the undisclosed connections did not rise to the level of "evident partiality."

C. Attorney Fees

Finally, Garofalo argues that Di Vincenzo should not have been awarded attorney fees for litigating the confirmation of the arbitration award in circuit court. On appeal, Garofalo makes three arguments. First, Garofalo argues that Di Vincenzo failed to comply with Rule 3:25 because she did not assert her request for attorney fees in her motion to confirm arbitration award. Second, he argues that Di Vincenzo's inclusion of language in her motion to confirm stating, "Any and all claims for relief not specifically addressed herein, including any requests for injunctive relief, declaratory relief, and punitive damages, are denied," had the effect of

- 18 -

barring her from asking for attorney fees in her responsive pleading. Third, he argued that Di Vincenzo failed to comply with Rule 3:25 because she failed to "identify the basis upon which the party relies in requesting attorney fees."

Garofalo's first argument was properly rejected by the circuit court below. Di Vincenzo asserted her claim for attorney fees in her "Response in Opposition to [Garofalo's] Cross-Petition to Vacate." The cross-petition to vacate was effectively a counterclaim in this action, and Di Vincenzo's response to it was effectively a responsive pleading. Therefore, as the circuit court found, the attorney fees claim was asserted in a responsive pleading, as contemplated by Rule 3:25. To hold otherwise would unnecessarily set more stringent rules for attorney fee requests in proceedings to confirm arbitration awards than in other civil proceedings.

Garofalo's second argument is also unavailing. The language regarding a denial of any claims "not specifically addressed herein" appears at the end of the motion to confirm, where Di Vincenzo evidently reproduced the language used by the FINRA arbitrators in her arbitration award. The line Garofalo emphasizes, listed as number eight, follows a list of seven rulings, both in the award and in the motion to confirm, stating Garofalo's liability on Di Vincenzo's claims and the denial of Garofalo's counterclaims before the arbitration panel. In context, the language clearly refers to the arbitrators' denial of unaddressed claims made before the FINRA panel, not to Di Vincenzo's disavowal of claims related to the circuit court confirmation proceeding.

Garofalo's third argument was never made to the trial court and is therefore not subject to appellate review. Rule 5A:18 ("No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice."); *Creamer v. Commonwealth*, 64 Va. App. 185, 195 (2015) ("The purpose of this contemporaneous objection

requirement is to allow the trial court a fair opportunity to resolve the issue at trial, thereby preventing unnecessary appeals and retrials."). While Garofalo did respond to Di Vincenzo's application for attorney fees by asserting a failure to meet Rule 3:25, his argument was that Di Vincenzo failed to comply by omitting the request from her motion to confirm, not that she failed to identify the basis of her award. Garofalo's third argument for reversing the grant of attorney fees is, therefore, waived.

## III. CONCLUSION

For all of the foregoing reasons, we affirm the circuit court's judgment.

*Affirmed.*